1

2

3

4                    UNITED STATES DISTRICT COURT

5                  NORTHERN DISTRICT OF CALIFORNIA

6

7    BOYD ET AL,                           Case No. 23-cv-04085-EMC

8              Plaintiff,

9        v.                                ORDER GRANTING IN PART AND
                                           DENYING IN PART PLAINTIFFS'
10   CITY OF SAN RAFAEL ET AL,             MOTION FOR PRELIMINARY
                                           INJUNCTION
11             Defendant.
                                           Docket No. 1

12

13

14         Like many cities across our state, the City of San Rafael (the "City") is faced with a

15   problem with its unhoused citizens.  The City concedes the number of unhoused on the streets

16   exceeds the number of available shelter beds.  Thus, consistent with *Martin v. City of Boise*, 920

17   F.3d 584 (9th Cir. 2019), the City understands it cannot criminalize those who are involuntarily

18   unhoused.  To address a large and growing encampment and health and safety concerns

19   accompanying large encampments, the City, rather than establishing a safe sanctioned

20   encampment area or taking an incremental approach to addressing its concerns, enacted an

21   ordinance (the "Ordinance") which wholly disperses the unhoused to campsites which, as a

22   practical matter, can accommodate only one to two campers; these campsites must be separated by

23   200 feet, *i.e.*, nearly two thirds of the length of a football field.  Although *Martin*, does not

24   eliminate a city's discretion to determine where unhoused persons may camp within the city, there

25   are constitutional and statutory requirements that assure citizens, including the unhoused, due

26   process, that require consideration of reasonable accommodation to those with disabilities, and

27   that prevent citizens from being exposed to unreasonable dangers affirmatively created by

28   governmental actors.

United States District Court
Northern District of California

For the reasons stated below, the Court concludes that full enforcement of the Ordinance is likely to inflict irreparable harm upon the Plaintiffs and threatens to impinge upon certain legal rights. On the other hand, maintaining a blanket injunction and leaving the encampment in place would impose significant hardships upon the City and threaten its valid interest in safeguarding public health and safety. The Court will lift the broad temporary restraining order and issue a narrowly tailored preliminary injunction which permits enforcement of the Ordinance under limited conditions, conditions which accommodate the competing interests of both parties while minimizing their respective hardships.

## I.     <u>BACKGROUND</u>

The case at bar concerns the recent enactment and adoption of an ordinance by the City of San Rafael that prohibits camping, including sleeping, on certain public property without exception and imposes size, density, and proximity limitations on campsites. The Plaintiffs in this action include "Camp Integrity," a self-named community of campers located in part of San Rafael's Mahon Creek Path ("MCP"), the San Rafael Homeless Union (the "Union"), and thirteen residents at the MCP encampment[1]. The MCP encampment is comprised of over 30 tents and offers a communal bathroom, handwashing station, and other resources. Plaintiffs seek a preliminary injunction preventing the Ordinance from going into effect. Defendants include the City and certain of its officials.

San Rafael's former anti-camping scheme prohibited camping in parks, buildings, or parking lots, but included an exception if the individual had no alternative shelter. (San Rafael Municipal Code ("SMC") Section 19.20.080(C)). The City manager could absolutely prohibit camping in specific parks if there was a threat to public, health, safety, or welfare by administrative order. *Id.* The new statute, SMC section 19.50, designates certain, identified land in San Rafael as camping-prohibited, without exception. For all other land, an exception allows camping when the person camping has no alternative shelter. When camping is allowed, each campsite must be 200 feet apart and limited to 100 square feet for one person or 200 square feet for

---

[1] The encampment along the Mahon Creek Path ("MCP encampment") is sometimes referred to as "Camp Integrity" throughout this Order.

United States District Court
Northern District of California

all others—including belongings. Camping in violation of the statute is criminally punishable by up to six months in jail and/or a $500 fine.

On August 15, 2023, Judge Thompson issued a temporary restraining order to halt the Ordinance from going into effect as planned on August 16, 2023, until a hearing on the preliminary injunction. She found that serious questions were raised as to the merits of Plaintiffs' claim that the Ordinance violates the Eighth Amendment's Cruel and Unusual Punishment Clause, as interpreted by the Ninth Circuit in *Martin*, 920 F.3d 584. *See* Docket No. 19, at 14–15, 15 n.2. Specifically, she found serious doubt as to whether any areas in San Rafael remained available for persons with no alternative shelter to camp, *i.e.*, sleep lawfully under the new Ordinance—thus impermissibly criminalizing the status of homelessness under *Martin*. *Id.* Judge Thompson declined to reach Plaintiffs' other claims. *Id.* at 15 n.4.

The City has since submitted a map identifying areas where camping remains lawful in San Rafael, which abates much concern regarding a simple violation of *Martin*. However, the Ordinance poses significant danger to Plaintiffs, implicating their due process rights and rights under the Americans with Disabilities Act, among others. Namely, the Ordinance effectively limits campsites to one or two campers and isolates each campsite from the next by 200 feet, depriving campers who need, for various reasons, some community to safely survive. Forced isolation exposes unhoused women who have experienced victimization to sexual, domestic, or other violence. It separates disabled Plaintiffs from caretakers upon whom they rely. It prevents neighbors from administering aid in a medical emergency such as a drug overdose, something that has occurred more than once in this campsite. Moreover, the Ordinance leaves the unhoused on their own to find permissible places to camp, under circumstances where such campsites may be relatively scarce. Further, unhoused persons face an indefinite risk of eviction and prosecution were someone else to set up a camp near them, violating the mandated buffer zone, regardless of knowledge or control. The City does not have a plan to mitigate these harms and resists implementing any administrative scheme to assure an orderly allocation, assignment, or registration of permissible campsites, leaving the unhoused displaced under the Ordinance to play a game of musical chairs.

At the same time, the Court is acutely aware of the important health and safety concerns posed by large, concentrated encampments that the City seeks to abate via the Ordinance, including risk of fire, accumulation of refuse, and proliferation of criminal activity.

Thus, having considered the irreparable harm with which Plaintiffs are threatened, the balance of hardships considering a narrowly tailored injunction, and the strength of the Plaintiffs' showing on the merits, the Court hereby **GRANTS** in part and **DENIES** in part Plaintiffs' motion for a preliminary injunction.  The City may enforce SMC Section 19.50 at the Mahon Creek Path encampment and against Plaintiffs in this action, but with conditions which permit Plaintiffs to maintain some semblance of community, affording them an opportunity for mutual protection and assistance while preserving the City's goal of breaking up large encampments.  Specifically, while the City is permitted to break up the encampment at issue, the City must allow 400 square-foot encampments, housing up to four people, and may impose a 100-foot buffer between campsites instead of 200-foot buffer.  The City must also ensure there is a process clearly identifying permissible sites and an orderly process by which such sites may be allocated or claimed.  This injunction relates only to those who have brought this suit, *i.e.*, the individual Plaintiffs with standing and residents of the Mahon Creek Path encampment represented in this action by the Plaintiff San Rafael Homeless Union.

## II.      <u>PROCEDURAL HISTORY</u>

Camp Integrity and ten individual plaintiffs filed their complaint and ex parte application for a temporary restraining order and preliminary injunction on Friday, August 11, 2023.  *See* Docket No. 1.  Defendants include the City of San Rafael, as well as the City Manager, Chief of Police, Assistant City Manager, Director of Public Works, Mayor of the City, and City Council Persons.  *Id.* at 11–12.  The City was personally served at the City Clerk's Office at 1400 Fifth Street, San Rafael CA 94901 around 1:00 pm on August 11th.  *Id.* at 40.  The same day, the Court filed a briefing schedule that was served on all parties via email.  *See* Docket No. 14.  Judge Thompson held a hearing regarding Plaintiffs' motion for temporary restraining order on Tuesday, August 15, 2023, via Zoom Videoconference.  Judge Thompson granted Plaintiffs' request for temporary restraining order.  *See* Docket No. 19.

1        Subsequently, the parties filed additional briefs addressing Plaintiffs' request for a

2  preliminary injunction.  Defendants filed an opposition and supporting declarations, Docket Nos.

3  24–30, and Plaintiffs filed a reply in further support of their motion and supporting declarations,

4  Docket No. 32.  A hearing was held by this Court on Wednesday, September 6, 2023, via Zoom

5  Videoconference.  At that time, Defendants consented to extension of the TRO until parties could

6  brief supplemental issues and the Court could hear additional oral argument.  The parties

7  submitted additional papers in support and opposition of the motion.  *See* Docket Nos. 72, 74, 76.

8  Plaintiffs filed a First Amended Complaint ("FAC") on September 26, 2023, adding three

9  individual Plaintiffs and the San Rafael Homeless Union as Plaintiffs.  Docket No. 77 ("FAC").

10  The complaint was otherwise nearly identical.  *Compare* Docket No. 1 *with* Docket No. 77.  The

11  Court again held oral argument on October 2, 2023.  At that time, the parties put on live witnesses

12  and the Court heard additional argument on October 3, 2023.

### III.      FACTUAL BACKGROUND

14        Individual Plaintiffs in this action are thirteen residents of Camp Integrity who do not

15  otherwise have stable housing, along with the entities Camp Integrity and the San Rafael

16  Homeless Union.  Docket No. 1 ¶ 1; FAC at 10, 12.  The MCP encampment where Plaintiffs[2]

17  reside receives donations of water, food, and blankets, and features a communal handwashing

18  station and cooling center.  *See* Docket No. 1 at 10, ¶ 102.  There were about 33 tents in Plaintiffs'

19  encampment, which is in part of the Mahon Creek Path in San Rafael, at the outset of this

20  litigation.  Docket No. 16-2 at 3.  The City now estimates that there are 61 tents at the Path.  The

21  encampment has grown in recent months following closure of other encampments in the City.

22        Defendants recognize that the City of San Rafael is presently unable to provide adequate

23  shelter to its homeless population.  *See id.* at 2–3.  Specifically, the City acknowledges that "units

24  and shelters available in the city are typically full, except occasional turnover averaging two beds

25  per week."  *Id.* at 2.  A 2022 Point in Time ("PIT") count of the homeless population in Marin

26  County conducted by the City, as was required by the Department of Housing and Urban

27

28

---

[2] Hereinafter "Plaintiffs" refers to the Individual Plaintiffs unless otherwise specified.

United States District Court
Northern District of California

1    Development ("HUD"), found that there were 348 homeless individuals in San Rafael and 241

2    were unsheltered. *Id.* at 2; Docket No. 24 at 5.  The City believes this figure is overinclusive

3    because the PIT count of 348 people included those living on public property, private property,

4    and offshore areas.  Docket No. 24 at 5.  The City now estimates that 120 persons are unsheltered

5    and living on public property in San Rafael.  *Id.*; Murphy Decl. ¶ 5.  The City does not explain

6    why the PIT estimation of 241 unsheltered persons in San Rafael is not accurate.  Regardless,

7    under either scenario, shelter space is insufficient to house the unsheltered population in San

8    Rafael at present.  Many of the Plaintiffs have submitted requests to the City for shelter placement

9    and all assert that they want long-term housing.  *See* Docket No. 1 ¶ 1; Docket No. 1-2, Boyd

10   Decl., Ex. A, Metz Decl., Ex. B Nelson Decl., Ex. C, Barrow Decl., Ex. B, Cook Decl., Ex. B;

11   Docket No. 1-3, Aardalen Decl., Ex. B; Docket No. 1-4, Hensley Decl., Ex. A, Mendoza Decl.,

12   Ex. B.

13        The City's current response was to enact an ordinance designed to break up large

14   encampments like the encampment at the Mahon Creek Path and disperse unhoused individuals

15   throughout the City.  At the center of this litigation is the City's evident intent to enforce the new

16   Ordinance against the MCP encampment.

**A.      Statutory Scheme**

18        The previous anti-camping statute in San Rafael prohibited camping in any park, building,

19   or portion thereof, including the parking lot of any such area.  SMC § 19.20.080(C)(1).  The

20   statute included an exception allowing camping in all of these areas when no alternative shelter

21   was available to the person camping.  SMC § 19.20.080(C)(3).

22        The new statute identifies certain areas where camping is banned without exception

23   (Section 19.50.030); for all other land, camping is allowed under an exception for persons who

24   have no alternative shelter available (Section 19.50.040(A)–(B)).

25        To this end, Section 19.50.030 prohibits camping absolutely at:

26   •   Open space property.  ("Any parcel or area of land or water which is essentially

27        unimproved natural landscape area, such as rivers, streams, watershed and shoreline

28        lands, forest and agricultural lands, ridges, hilltops, canyons and other scenic areas,

United States District Court
Northern District of California

6

acquired and/or leased by the city for open space purposes."). SMC §§ 19.50.020(E), 19.10.020.

- Public rights-of-way and sidewalks, "or portion[s] thereof." ("Public right-of-way" is defined as "land which by written instrument, usage or process of law is owned by, reserved for or dedicated to the public use for street or highway purposes, or other transportation purposes, whether or not such land is actually being used or developed specifically for those purposes."). SMC §§ 19.50.020(I), 11.04.020.

- Public facilities. ("Any building, structure, or area enclosed by a fence located on public property, whether secured, unsecured, locked, unlocked, open, or enclosed."). SMC § 19.50.020(G).

- Within 10 feet of any public utility. ("Public bathrooms, and electrical boxes, fire hydrants, and similar equipment . . . but does not include light or electrical poles."). SMC § 19.50.020(J) .

- Within 100 feet of any playground.

- City-owned parking garages.

- Any public property "determined to be a threat to the public health, safety, or welfare," when designated as such by the city council or city manager via administrative order or resolution. SMC § 19.50.030(B).

The new statute also introduces size, density, and proximity limitations when camping is allowed in section 19.50.040(C). Campsites may not extend beyond 100 square feet for one person or 200 square feet for two or more people. SMC §§ 19.50.040(C)(2), 19.50.020(D). All items must be kept within the campsites and if not, will be treated as abandoned property and may be discarded. SMC § 19.50.040(C)(2)(a)–(b). Campsites may not be within 200 feet of any other campsite. SMC § 19.50.040(C)(4).

Key definitions including an updated definition of the term "camp" or "camping," are in SMC section 19.50.020. Further, the Ordinance allows for punishment of up to six months in jail and/or a $500 fine if found to be camping in violation of the statute. SMC §§ 19.20.110, 1.42.010.

**United States District Court**
**Northern District of California**

**B.**   <u>Harm to Plaintiffs if the Ordinance is Enforced in Full</u>

Plaintiffs explain that (1) they rely on other, proximate campers and communal resources for survival and (2) they fear isolation imposed by the Ordinance will expose them to serious and, in some cases, life-threatening harms.  Docket No. 1 ¶¶ 78–104.

**Caretakers and resources for physically disabled Plaintiffs.**  Certain Plaintiffs have suffered physical injuries causing them to rely on others to get food, water, and shade and to move around.  *Id.* ¶¶ 78–80, ¶¶ 86–87.  Plaintiff Anker Aardalen mostly uses a wheelchair due to a dislocated knee.  Docket No. 1-3, Aardalen Decl., Ex. I ¶¶ 11–12.  Mr. Aardalen relies on nearby campers to get access to food, water, and other resources.  *Id.*; Docket No. 1 ¶¶ 86–87.  Plaintiff Eddy Metz has a torn meniscus in his left knee, aggravated by a previous camp eviction.  Docket No. 1-2, Metz Decl., Ex. E ¶ 6.  This injury makes it difficult for Mr. Metz to walk.  *Id.* Accordingly, Mr. Metz "rel[ies] heavily" on neighbors at Camp Integrity to bring him water and food each day.  *Id.* ¶¶ 9–10.  Plaintiff Brian Nelson suffers from sleep apnea and relies upon a CPAP machine; he needs access to electricity, which is more available in a communal campsite.  Docket No. 1 ¶ 80; Docket No. 1-2, Nelson Decl., Ex. C at 74–75.  All Plaintiffs with disabilities expect to lose critical assistance in gaining access to food, water, shade, and housing services if they are forced to camp away from their community.  Docket No. 1 ¶ 87.

**Protection from gender-based violence and crime.**  Other Plaintiffs rely on fellow campers for protection against sexual and domestic violence and human trafficking; safe campsites provide space away from abusers and camping in a group offers protection from attacks.  *See, e.g.*, Docket No. 1-3, Schonberg Decl., Ex. K ¶¶ 1–24, Huff Decl., Ex. J ¶¶ 8–11; Docket No. 1-4, Mendoza Decl., Ex. N ¶¶ 15, 17.  Ms. Mendoza, who was a childhood victim of sexual abuse has been attacked while living on the street and relies on others she trusts to protect her.  Docket No. 1-4, Mendoza Decl., Ex. N  ¶¶ 13, 16–17.  In one instance, Ms. Mendoza was defended against a stalker by fellow members of the MCP encampment who persuaded the man to leave her alone.  *Id.* ¶¶ 15, 17.  Another Plaintiff, Ms. Huff, is a victim of domestic violence and has been raped multiple times while living on the street.  Docket No. 1-3, Huff Decl., Ex. J ¶¶ 3, 8–11.  Ms. Huff has also survived human trafficking at the hands of a prison gang that continues to threaten her

and sometimes watches or follows her in San Rafael. *Id.* ¶ 8. Ms. Huff relies on nearby campers to protect her from these former abusers and to prevent future attacks. *Id.* ¶ 10. She explains the MCP encampment "is one of the few places that [she] feel[s] safe." *Id.* ¶ 11. For these women and others, camping communally appears to be vital. As Plaintiff Shaleeta Boyd explained in her testimony, there are no locks on tents, and they can be cut open; being a woman in this situation is terrifying.

In support of the above, Dr. Jeffrey Schonberg, Ph.D., a researcher focusing on people experiencing homelessness in the Bay Area, has offered an expert report analyzing the impact of SMC Section 19.50 on unhoused persons. *See* Docket No. 1-3, Schonberg Decl., Ex. K. Dr. Schonberg explains the Ordinance will "significantly increase the risk of sexual assault, domestic violence, and human trafficking perpetrated against women who are unhoused." *Id.* ¶ 12. This is because the statute decreases women's access to capable guardians and increases exposure to offenders—key factors in victimization of unhoused women. *Id.* ¶¶ 13–14. Being afforded sufficient protection from abusers is particularly important because 39% of unsheltered women report intimate partner violence while living on the street. *Id.* ¶ 14. Women are also susceptible to attack by strangers; 49% of attacks of unsheltered persons are committed by someone the person does not know. *Id.* ¶ 15. Because, under the Ordinance, unsheltered women would not have a central location to access resources, they must travel more often to obtain food, water, and other necessities, increasing the opportunity to be attacked. *Id.* ¶¶ 16–17. At oral argument, even Lynn Murphy, the City's mental health liaison, agreed in her testimony that camping in isolation could be devastating to an unhoused person. Specifically, Ms. Murphy stated, "I completely agree with Dr. Schonberg that isolation can be devastating, [as is] a lack of social connectiveness." Ms. Murphy continued that she believes that that connectiveness "can exist in a group of three or four people."

**Protection against theft.** Similarly, the Plaintiffs camp in groups to offer protection from crime including theft. Mr. Nelson explained that he relies on nearby campers to protect his belongings, including his medical machines, from being stolen if he needs to be away from camp. Docket No. 1-2, Nelson Decl., Ex. C at 75. Similarly, Ms. Boyd testified that her tent and all of

her belongings were stolen while she was camping away from most tents on the Mahon Creek Path.  Though there was one tent across the path from her, that person did not offer her protection.  However, her items and tent have not been stolen since she moved to the larger cluster of tents.

**Needs of those with potential psychological disabilities.**  Several Plaintiffs suffer from psychological disabilities because of violence they have endured and thus rely on nearby campers to feel safe and to manage these disabilities.  Ms. Mendoza states she suffers from PTSD from childhood sexual abuse.  Docket No. 1-3, Mendoza Decl., Ex. N ¶¶  11, 13.  Accordingly, Ms. Mendoza must camp near multiple people that she trusts to fall asleep and prevent mental health episodes.  Docket No. 1-4, Mendoza Decl., Ex. A at 151–52.  Ms. Huff similarly is a survivor of childhood sexual abuse and has complex PTSD as a result.  Docket No. 1-3, Huff Decl., Ex. J  ¶ 5.  Ms. Huff relies upon sleeping near people that will protect her from her abusers so she can feel and be safe.  *Id.* ¶¶ 9–10.  Mr. Nelson was attacked by knife earlier this year.  Docket No. 1 ¶ 80; Docket No. 1-2, Nelson Decl., Ex. C at 77.  He was stabbed by someone that he did not know sixteen times.  *Id.*  As a result of this event, Mr. Nelson suffers from PTSD that is triggered when he is not around familiar people.  *Id.* at 74, 77.  Plaintiff Amanda Binkley suffers from anxiety, PTSD, and depression that would be aggravated by being isolated in an atomized campsite.  FAC ¶ 87.  Similarly, Plaintiff Anthony Tringali suffers from depression that would be aggravated by social isolation.  *Id.* ¶ 88.

Plaintiffs that suffer from physical and psychological disabilities have submitted requests for reasonable accommodation to the City to no avail.  Plaintiffs Amalia Mendoza, Brian Nelson, Christie Marie Cook, Eddy Metz, and Anker Aardalen submitted Requests for Reasonable Accommodations to the City.  Docket No. 1-4, Mendoza Decl., Ex. A; Docket No. 1-2, Nelson Decl., Ex. C; Docket No. 1-2, Cook Decl., Ex. A; Docket No. 1-2, Metz Decl., Ex. B; Docket No. 1-3, Aardalen Decl., Ex. C ("Accommodation Requests").  In addition to requesting housing, Plaintiffs request the ability to camp near others.  *Id.*  Namely, Mr. Aardalen who cannot walk easily requests the ability to remain near other campers and resources so he can have continued access to food, water, shade, and other life-sustaining resources.  Docket No. 1 ¶¶ 79, 86.  Ms. Mendoza and Ms. Huff request the ability to sleep near other safe campers to prevent mental

1  health episodes caused by PTSD from sexual trauma.  Docket No. 1-4, Mendoza Decl., Ex. A at

2  22–23; Docket No. 1-3, Huff Decl., Ex. J ¶¶ 10–11.  Mr. Nelson requests the ability to camp

3  communally to allow access to electricity as is needed for his CPAP machine and to accommodate

4  PTSD from the stabbing attack that he endured.  *See* Docket No. 1-2, Nelson Decl., Ex. C at 74–

5  75.  The requests were submitted, at the latest, in mid-August.  *See* Accommodation Requests.  At

6  present, the City has not engaged in an interactive process with Plaintiffs to discuss

7  accommodations despite its policy requiring that the City respond to requests within fifteen days

8  of its receipt.  Docket No. 72, Jeppson Decl. ¶ 2.  The City has not expressed any intention to

9  respond to Plaintiffs' requests.

10      **Prevention of drug overdose and help in emergency situations.**  Other Plaintiffs fear

11  being separated from neighbors who could save them by administering Narcan or adrenaline in

12  case of an accidental drug overdose.  Docket No. 1 ¶¶ 92–97; Docket No. 1-3, Aardalen Decl., Ex.

13  I ¶ 6; Docket No. 1-2, Nelson Decl., Ex. F ¶¶ 9–11.  Mr. Aardalen was saved from an accidental

14  overdose recently by a nearby camper.  Docket No. 1-3, Aardalen Decl., Ex. I ¶ 6; Docket No. 1 ¶

15  92.  Brian Nelson attests that his training as a veterinary technician makes him able to administer

16  adrenaline effectively, and that he has revived four people during overdoses.  Docket No. 1-2,

17  Nelson Dec., Ex. F ¶¶ 9–12.  At oral argument on October 2, 2023, Plaintiffs indicated that there

18  was recently another overdose at the MCP encampment and an incident where an individual

19  suffered an epileptic seizure and received emergency care from nearby campers.  Dr. Schonberg

20  explained in his testimony that in emergency situations such as these, time and proximity is of the

21  essence and campers rely on each other for help.  Ms. Murphy agreed in her testimony that using

22  drugs in a group instead of isolation offers protection; she testified that an effective tactic is to

23  have one person remain sober with Narcan available while other campers use drugs to prevent

24  mortal outcomes.  Dr. Schonberg estimates that the Ordinance, if enforced, will result in a 15%-

25  25% increase in drug overdose deaths because "one of the single largest risk factors of overdose is

26  using in isolation."  Docket No. 1-3, Schonberg Decl., Ex. K ¶ 21.

27      **Hindered access to community support and resources.**  As a general matter, Plaintiffs

28  allege that communal camping is vital for access to food, water, shelter, and resources including

United States District Court
Northern District of California

handwashing stations, bathrooms, and air-cooling stations.  *See* Docket No. 1 at 10, ¶¶ 91, 102, 104.  Further, a centralized encampment provides a singular location where volunteers drop off donations of water, food, blankets, and other necessities.  *See id.* ¶ 102.  Ms. Murphy testified that she cannot state with certainty whether the volunteer organizations that visit the now larger, centralized encampments have the means to conduct visits and/or outreach to all campsites in San Rafael if dispersed.  One vital resource for Plaintiffs that would be jeopardized, as explained at oral argument, is access to phone charging stations; without a phone Plaintiffs cannot make phone calls for help in case of emergency or conduct calls to make appointments, seek employment, receive medical care, or pursue housing opportunities.  Ms. Murphy testified that solar charging stations are sometimes distributed in encampments.  It is not clear whether campers would have access to these chargers if scattered, and Plaintiffs may also be hindered from sharing mobile devices in emergencies if separated.

In general, Dr. Schonberg explains that the Ordinance is also dangerous because it breaks up "essential survival strategies based on community acts of obligation and reciprocation."  Docket No. 1-3, Schonberg Decl., Ex. K ¶ 11.  In other words, unhoused persons establish a communal framework whereby they exchange favors to stay alive.  Dr. Schonberg testified that the Ordinance's disallowance of community encampments interferes with the acquisition and exchange of "informal social capital" through the maintenance of relationships with others on the streets.  This informal social capital is the currency by which unhoused people gain protection, support, and resources to survive, *i.e.*, by having one another's backs.  The Ordinance hinders this mutual exchange of assistance.  The Ordinance also disrupts this delicate and important communal framework in other ways.  As one example, Jason Sarris, member of the County of Marin Homeless Policy Steering Committee ("HPSC") warns that the Ordinance "pit[s] the unhoused against one another" because of the need to self-police a 200-foot buffer around each campsite.  Docket No. 32-12, Sarris Decl. ¶ 9(c).

The eventualities of isolation for unhoused persons in vulnerable categories is particularly important because many unhoused persons fit this description.  Dr. Schonberg testified that a large portion of the unhoused population suffers from mental health or substance abuse issues and

nearly all unhoused persons suffer insecurity of access to food and other necessities.

**Instability and uncertainty for the unhoused.**  In addition to disrupting the communal frameworks on which Plaintiffs rely, the Ordinance introduces chaos into an already unsafe and unpredictable situation (homelessness).  The City has prepared a street level map showing how many campsites can be accommodated in the City in identified parks and public spaces.  *See* Docket No. 74, Ahuja Decl., Ex. A.  However, the map does not show where those campsites can be maintained with any precision.  *See id.* at 17.  The City has asserted in its filings and at oral argument that it does not intend to set forth an allocation process, *e.g.*, establishing designated campsites or assigning land on, for example, a first-come-first-serve or need basis.  *See* Docket No. 72 at 16 ("To be clear, allowable space will *not* be allotted.").  The Ordinance does not establish any system for designating space for campers, for resolving competing claims for space, or establish how intrusion by a third-party camper into the required buffer space is to be resolved.  Indeed, the City explains that it may evict all campers regardless of who maintained their campsite first.  *See id.* ("But if [who was there first] is uncertain or disputed, everyone is going to have to leave.").  The City also does not offer any assistance or explanation of how campers are to physically move their tents and sleeping gear if forced out of their campsite.  Accordingly, the Plaintiffs face uncertainty as to where to go, how to get there, along with continued, unpredictable eviction and the ensuing hardship of relocation.  This hardship may fall disproportionately upon more vulnerable persons (*e.g.,* those with physical disabilities or women) who are unable to effectively self-police their campsite buffer.  The hardship will be exacerbated if the number of unsheltered persons in San Rafael is 241 as the per the City's 2022 PIT estimate compared to its present estimate of 120 persons which would make available permissible campsites scarcer.  *Compare* Docket No. 24 at 5 *with* Docket No. 16-2 at 2–3.

C.    <u>Harm to the City</u>

On the other hand, the City has identified substantial health and safety problems with the current encampment as large as it is, and which appears to be growing.  The City asserts that the Mahon Creek Path encampment and large encampments pose increased risk of fire, harm to neighboring businesses, increased levels of criminal activity, increased level of emergency

response calls, safety concerns for middle school students using the Mahon Creek Path to get to school, waste and refuse issues, and hindrance on outreach.

**Fire hazards.**  Fire Chief of the San Rafael and Marinwood Fire Departments, Darin White, identified fire risks at the MCP encampment including unsafely rigged generators at the campsites.  Docket No. 24 at 9; Docket No. 16, White Decl. ¶¶ 2–3.  Chief White testified at oral argument that larger encampments present heightened fire risk because of accumulation of flammable materials such as cardboard, wooden pallets—which are often made of dried instead of fresh wood—and plywood.  Further, modern tents are made of highly flammable materials including polyester.  Chief White explained that as a general matter, there is an increased risk of fire in large encampments because tents close together are especially prone to ignition and rapid spread, and also because campers tend to accumulate debris between tents that can spread fire.  Docket No. 16, White Decl. ¶¶ 4–5.  In some other areas in San Rafael aside from the MCP encampment, there are risks of wildfires.  *See id.* ¶ 6.  Chief White further testified at oral argument that the presence of dried vegetation, gas canisters, cigarettes, improper wiring, and use of indoor outlets outside.  At the MCP encampment, a lamp post electrical wiring had been tapped into, presenting fire risk.

Chief White also explained that cooking near a tent poses fire risks.  Chief White testified that it would be unsafe to have two to three tents within a 200 square foot space, both because of proximity of the tents and because using any sort of cooking mechanism in that amount of space would not allow sufficient distance between the tent and the cooking apparatus.  Chief White also testified that although fire risks are posed by singular tents, smaller clusters, as well as large encampments, the larger the encampment, the larger the fire risk.  Chief White also explained that 100 feet of distance between tents would provide a safe fire buffer.

**Harm to neighboring businesses.**  Carl Huber, Lieutenant in the San Rafael Police Department ("SRPD") attests that employees no longer feel safe working near the encampment and two employees quit.  Docket No. 28, Huber Decl. ¶ 11.  Lieutenant Huber further attests an occupant of the MCP encampment (not party to this suit) attempted to sexually assault the manager of a nearby food retailer and masturbated in front of her; this occurred approximately 100

14

feet away from the camp.  *Id.* ¶ 12.

**Increase in criminal activity and safety calls and the "interior-exterior" problem**.
Lieutenant Huber attests that large encampments have higher levels of criminal activity in and
around the campsite compared to individual encampments.  Huber Decl. ¶¶ 4–10.  The tents on the
exterior act as a barrier to internal areas, providing a greater ability to conceal criminal activity
and posing difficulty for emergency responders to get into the camp.  *Id.* ¶ 16.  Further, as the
MCP encampment grew, there was a notable increase in criminal cases and calls to the police,
particularly for theft.  *Id.*  ¶¶ 10, 12.  There was likewise an increase in safety calls.  *Id.* ¶ 6.  One
Plaintiff was arrested for selling methamphetamine at the MCP encampment, though he denies
that allegation.

The City emphasizes the difficulties posed specifically by larger encampments.  Namely,
Lieutenant Huber testified in his declaration that "larger concentrated encampments" suffer from
increased levels of violence, criminality, impacts to surrounding neighbors, and non-emergency
and emergency calls as compared to "isolated individual or small encampments."  *Id.* ¶ 4.
Similarly, Ms. Murphy testified at oral argument that large encampments generally come with a
sense of lawlessness.  Ms. Murphy further testified that at a nearby encampment, the Menzies Lot,
a shooting occurred after the encampment grew somewhere around three to six tents, and a camper
self-started a fire at the encampment.

**Safety risks to students using the path to go to school.**  Students at San Rafael's
Davidson Middle School use the Mahon Creek Path to travel from the San Rafael Transit Center
to school.  *Id.* ¶ 13.  Parents expressed concern as the school year commenced.  *Id.*

**Waste and refuse.**  The City also asserts that the MCP encampment presents waste issues,
including an increased burden on the City in collecting trash.  Docket No. 25, Montes Decl. ¶ 5;
Docket No. 27, Murphy Decl. ¶ 12.  Although it is obvious that unhoused campers, even if
separated, would produce refuse as any human would, the City contends that campers tend to
accumulate more things and produce more waste in the aggregate when there are large
encampments.  To this end, Fire Chief White testified that in large encampments, campers tend to
fill space between tents with debris and accumulated items.  On the other hand, the City and

United States District Court
Northern District of California

Plaintiffs have each submitted filings showing that residents at the MCP encampment want to and do engage in regular cleanings of their campsite—including having lobbied the City for trash pickups, and there is an argument that centralized collection of trash is more efficient than collecting refuse from individual and small encampments spread throughout the City.  *See, e.g.*, Docket No. 32-1, Ex. B at 13; Docket No. 16-2 at 4; Docket No. 32 ¶ 6.

**Making things too comfortable for the unhoused.**  At oral argument Ms. Murphy also testified that larger encampments make the unhoused too comfortable and social with one another and thus hinder pursuit of alternative housing.  She explained some people do not want to leave camp to go to the DMV to obtain an ID or to go to housing appointments, preventing their ability to get access to housing long-term.  *See also* Docket No. 72-5, Murphy Supp. Decl. ¶ 7.  The City, however, did not present any specific evidence that this was the case with the Plaintiffs.

**Hindrance on outreach**.  The City also asserts that community groups are intimidated by having to approach large, concentrated camps, hindering outreach.  Docket No. 27, Murphy Decl. ¶ 17. Notably, however, there is no evidence that social workers have actually been hindered in their outreach to unhoused campers at Camp Integrity.  Moreover, it seems obvious that it is more efficient to have unhoused individuals proximate to organized and identified areas rather than scheduled throughout the City.

## IV.   DISCUSSION

### A.   Justiciability

1.   Standing

"To establish Article III standing, an injury must be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).  The injury must not be "too speculative."  *Id.*  "A plaintiff need not, however, await an arrest or prosecution to have standing to challenge the constitutionality of a criminal statute."  *Martin*, 920 F.3d at 609 (finding claims by unhoused people seeking prospective relief against future enforcement of an allegedly unconstitutional anti-camping statue were justiciable).  Rather,

[w]hen the plaintiff has alleged an intention to engage in a course of

16

> conduct arguably affected with a constitutional interest, but
> proscribed by a statute, and there exists a credible threat of
> prosecution thereunder, he should not be required to await and
> undergo a criminal prosecution as the sole means of seeking relief.

*Id.* (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).  In assessing threat of prosecution, the court should consider whether plaintiffs have a concrete plan to violate the law in question and whether prosecuting authorities have communicated a specific warning or threat to initiate proceedings.  *Teter v. Lopez*, 76 F.4th 938, 946 (9th Cir. 2023) (citing *Unified Data Servs., LLC v. FTC*, 39 F.4th 1200, 1210 (9th Cir. 2022)).

a.    Individual Plaintiffs

Except for two people, the individual Plaintiffs here have established standing.  As explained in depth in assessing irreparable harm, individual Plaintiffs assert an actual and concrete injury caused by the City's Ordinance; Plaintiffs have met standing requirements.

Additionally, there is at least a credible threat of prosecution here, as is required to establish standing in the pre-enforcement posture.  The MCP encampment as it exists violates San Rafael's new anti-camping scheme, leaving its residents subject to prosecution.  *See* Docket No. 3, Powelson Decl. Ex. L ¶ 6.  Plaintiffs' encampment is comprised of individual camps close to one another, violating, at a minimum, the Ordinance's prohibition of multiple encampments within 200 feet of each other.  Plaintiffs are thus currently engaging in behavior proscribed by the statute, *i.e.*, residing at the MCP encampment.  *See, e.g.*, Docket No. 1 ¶ 53; Docket No. 1-2, Nelson Decl., Ex. A ¶¶ 11–13; Docket No. 1-4, Mendoza Decl., Ex. C at 28.  The City, for its part, has communicated its intent to enforce the Ordinance against residents of the MCP encampment.  City officials have stated "[w]e know that at the Mahon Creek Path, individuals camping there will be displaced" due to the Ordinance.  Docket No. 1-3, Powelson Decl., Ex. A.  Further, Defendant Christopher Hess acknowledged that, "[t]he city's primary concern [for implementation] is the Mahon Creek Path Encampment [Camp Integrity] where we have 30 to 35 campsites currently."  Powelson Decl., Ex. L ¶ 6.  The Agenda Report for adoption of the Ordinance is almost entirely focused upon the Mahon Creek Path, suggesting campers on the path are the primary target of the Ordinance.  *See* Docket No. 16-2 at 3–4, 6, 8.  Accordingly, for the individual Plaintiffs *that continue to reside at the Mahon Creek Path*, a credible threat of prosecution exists under the

United States District Court
Northern District of California

1  challenged Ordinance.

2      On the other hand, some individual Plaintiffs no longer reside at the MCP encampment.

3  Namely, Shaleeta Boyd testified at oral argument on October 2, 2023, that she has alternative

4  housing and is no longer living at the Mahon Creek Path.  Further, Lynn Murphy testified at oral

5  argument on October 2, 2023, that Plaintiff Eddy Metz has moved out of the MCP encampment

6  and is now residing upon a nearby street.  Plaintiffs did not originally dispute this assertion at oral

7  argument.  However, subsequently, Mr. Metz contends that he remains part of "Camp Integrity"

8  though he has moved outside of the nuclear cluster of tents on the Mahon Creek Path.  *See* Docket

9  No. 97.  As the record contains sparce information about the characteristics of encampments along

10 the street where Mr. Metz is currently residing, and at present the City has not evidenced an intent

11 to enforce the new statute or former anti-camping ordinance[3] beyond the large cluster of tents on

12 the Mahon Creek Path, Mr. Metz lacks standing to challenge the Ordinance currently.  Ms. Boyd

13 likewise lacks standing as she is presently housed and does not reside at the Path.[4]

14          b.      Organizational Plaintiffs

15      "The doctrine of associational standing permits an organization to 'sue to redress its

16 members' injuries, even without a showing of injury to the association itself.'" *Or. Advocacy Ctr.*

17 *v. Mink*, 332 F.3d 1101, 1109 (9th Cir. 2003) (quoting *United Food & Comm. Workers Union Loc.*

18 *751 v. Brown Group, Inc.*, 517 U.S. 544, 552 (1996)). An association has standing to sue on behalf

19 of its members when: "(1) its members would otherwise have standing to sue in their own right;

20

21 [3] The City has provided notice of its intent to enforce SMC § 19.020.080(R) – a section of the San
Rafael Municipal Code in existence prior to adoption of the Ordinance that is separate from the
22 previous anti-camping statute (which is SMC § 19.020.080(C)) at the Lindaro street encampments.
*See* Docket No. 94.  This subsection prohibits erecting buildings on public land and the City
23 intends to enforce SMC § 19.020.080(R) by removing wooden pallets at the encampment and
providing tents to those affected.  *Id.*  In other words, the City is not enforcing the anti-camping
24 statutes at issue in this suit (SMC § 19.020.080(C) and § 19.50) at campsites on Lindaro street.
Should the City endeavor to enforce the former anti-camping statute or new Ordinance against the
25 Lindaro street encampment (i.e. require the eviction or dispersal of residents), the standing
calculus for Mr. Metz would change.

26
27 [4] While Courtney Huff explains that she lives in an apartment occasionally, she testified that she
resides at the MCP encampment for periods of time due to safety concerns.  This may undermine
28 success on her Eighth Amendment claim, which provides protections for those who are
*involuntarily* homeless, but this does not entirely negate her having standing at this juncture.
Voluntarily or not, Ms. Huff intends to violate the ordinance by residing at the MCP encampment.

18

United States District Court
Northern District of California

1   (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the

2   claim asserted nor the relief requested requires the participation of individual members in the

3   lawsuit." *Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1096 (9th Cir. 2021) (citing *Hunt v.*

4   *Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).  The third prong is a "judicially

5   fashioned and prudentially imposed" question, as opposed to a constitutional requirement of

6   standing.  *Mink*, 322 F.3d at 1113 (citing *United Food & Comm. Workers Union Loc. 751*, 517

7   U.S. at 557 ("[T]he third prong of the associational standing test is best seen as focusing on these

8   matters of administrative convenience and efficiency, not on elements of a case or controversy

9   within the meaning of the Constitution.").

10       Under the first prong, the organization is "not required to identify individual Constituents

11  who satisfy each element of standing." *Disability Rts. Cal. v. Cnty. of Alameda*, 2021 WL

12  212900, at *7 (N.D. Cal. Jan. 21, 2021) (citing *Mink*, 322 F.3d at 1112).  Rather, the question is

13  whether the organization has established that "at least one" of its constituents "would have had

14  standing." *Id.*  (citing *Mink*, 322 F.3d at 1112).  The Union's members include residents of the

15  MCP encampment.  FAC at 10.  As explained above, at least one of the Union's members, *i.e.*,

16  individual Plaintiffs, have standing to sue, establishing the first prong of standing.  *See G.G. by &*

17  *through A.G. v. Meneses*, 638 F. Supp. 3d 1231, 1241 (W.D. Wash. 2022) (finding first prong

18  satisfied where individual plaintiffs that were members of the organization had standing).

19       As to the second prong, there is no doubt the interests the Union seeks to protect here are

20  germane to its purpose.  *See Am. Unites for Kids*, 985 F.3d at 1096.  The Union's defined mission

21  is to "organize, represent, advocate for, and support" its members.  FAC at 10.  Protecting the

22  constitutional rights of unhoused persons and ensuring that unhoused persons have continued

23  access to food, shelter, water, and safety fall squarely within the Union's stated purpose.  *See Am.*

24  *Unites for Kids*, 985 F.3d at 1097 (explaining that where there is a close connection between the

25  organization's mission and the interests of others it seeks to represent, organizational standing is

26  appropriate); *G.G. by & through A.G.*, 638 F. Supp. 3d at 1241 (finding nonprofit disability rights

27  organization had associational standing to bring claims on behalf of disabled members as rights of

28  people with developmental disabilities was an interest the organization sought to protect).

As to the third prong, this is a prudential consideration "designed to promote efficiency in adjudication." *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 951 n.9 (9th Cir. 2002). Here, allowing the Union to assert claims on behalf of its members promotes judicial efficiency by avoiding multiple, individual lawsuits being filed on behalf of each resident of the encampment. Further, the nature of the claims asserted do not counsel against associational standing. *See Laborers Int'l Union Loc. 261 v. City & Cnty. of San Francisco*, 2022 WL 2528602, at *6 (N.D. Cal. July 6, 2022) (explaining that unlike claims seeking damages which requires individualized proof, claims seeking injunctive relief are well-suited for adjudication by organizational plaintiff) (citing *Comm. for Immigrant Rts. of Sonoma Cnty. v. Cnty. of Sonoma*, 644 F. Supp. 2d 1177, 1194 (N.D. Cal. 2009)). Thus, the Court sees no need to find that the organization lacks standing as a matter of prudence. The Union has established organizational standing.

On the other hand, "Camp Integrity," is not properly before the Court because it is not represented by counsel. *See* Local Rule 3-9(b); *In re Am. W. Airlines*, 40 F.3d 1058, 1059 (9th Cir. 1994) ("Corporations and other unincorporated associations must appear in court through an attorney."). Accordingly, the San Rafael Homeless Union and the individual Plaintiffs, apart from Eddy Metz and Shaleeta Boyd who no longer reside along the Mahon Creek Path, have established standing and may properly pursue the claims asserted in this action.

### 2. Nature of claims (facial versus as applied)

Defendants argue that the Plaintiffs may only assert a facial claim to the Ordinance, and thus this claim is completely meritless because to prevail, the Plaintiffs must meet the rigorous burden of demonstrating that the Ordinance is unlawful in all circumstances. Docket No. 24 at 20–21 (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Though Plaintiffs allege that the statute is facially unconstitutional *e.g.*, for violating the First Amendment, *see* Docket No. 77 ¶¶ 57–71, Plaintiffs also allege that the statute is unconstitutional as applied to them because of circumstances rendering them particularly vulnerable. *See id.* ¶¶ 17, 75–104. Plaintiffs may assert claims challenging the validity of a statute as applied to a subset of the population in a pre-enforcement posture. *See, e.g.*, *Johnson v. City of Grants Pass*, 72 F.4th 868, 883 n.15, 883–84, 890 (9th Cir. 2023) (finding statute unconstitutional under Eighth Amendment as applied to

involuntarily homeless plaintiffs where standing was premised on credible risk of future enforcement of statute); *Isaacson v. Horne*, 716 F.3d 1213, 1230 n.15 (9th Cir. 2013) ("That the statute has not yet been applied to any of the plaintiffs does not preclude them from bringing a pre-enforcement, as-applied challenge. Many such challenges have been entertained in the past.") (collecting cases). As in *Grants Pass*, Plaintiffs here assert constitutional violations upon enforcement of the Ordinance against a subset of the unhoused population including those with vulnerabilities and/or disabilities. 72 F.4th at 883–84.

Defendants also argue that as to an as-applied challenge, such a challenge is premature because no enforcement action has been taken against Plaintiffs. *See* Docket No. 24 at 21 n.4. However, the threat of enforcement against the MCP encampment is concrete and substantial. The San Rafael City Council Agenda Report, which ultimately recommends adoption and enactment of SMC Section 19.50, explained explicitly that the Ordinance was needed because of circumstances at the MCP encampments. *See* Docket No. 16-2 at 3–4. The Report explains that it had received growing complaints related to "growing encampments at the Mahon Creek Path," among other encampments. *Id.* at 3. The Report continues: "By far the majority of complaints and San Rafael Police Department calls for service come from the encampments of approximately 33 tents (as of June 28, 2023) at the Mahon Path (also known in the community as the 'Mahon Creek Path.'" *Id.* The Report goes on to outline additional, specific conditions at the MCP encampment, and ultimately recommends the adoption of the Ordinance to curb the concerns due to this encampment. *See id.* at 3–6. The legislative record makes clear the City's intent to enforce the Ordinance against the encampment at the Mahon Creek Path. The City has not disclaimed such intent in this litigation. To the contrary, the City hosted an event on August 7, 2023, and August 14, 2023, at the Mahon Creek Path encampment to prepare for enforcement of the Ordinance that was originally to go into effect on August 16, 2023; the City distributed a flyer explaining how the camp had to change per the size and proximity limitations. *See* Docket No. 30 ¶ 8, Ex. 14. And in an email between Christopher Hess, the Assistant Director of Community Development for San Rafael, and an advocate for Plaintiffs, Mr. Hess stated that per SMC Section 19.50, "[w]e know that at the Mahon Creek Path, individuals camping there will be displaced." Docket No. 1-3 at

21

128.

Thus, Plaintiffs may properly challenge the Ordinance though it has not yet been enforced against them.  *See Grants Pass*, 72 F.4th at 883–84; *see also Robinson v. Att'y Gen.*, 957 F.3d 1171, 1177 (11th Cir. 2020) ("[A] plaintiff may establish standing to bring an as-applied/pre-enforcement challenge by showing that either '(1) [she] was threatened with prosecution; (2) prosecution is likely; or (3) there is a credible threat of prosecution.'") (quoting *Am. Charities for Reasonable Fundraising Regulation, Inc. v. Pinellas Cnty.*, 221 F.3d 1211, 1214 (11th Cir. 2000)).

**B.** **<u>Preliminary Injunction</u>**

Under Federal Rule of Civil Procedure 65, the Court has the authority to issue a preliminary injunction.  A party seeking such preliminary relief must meet one of two variants of the same standard.  The traditional *Winter* standard requires the movant to show that (1) it "is likely to succeed on the merits;" (2) it "is likely to suffer irreparable harm in the absence of preliminary relief;" (3) "the balance of equities tips in [its] favor;" and (4) "an injunction is in the public interest."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Under the "sliding scale" variant of the same standard, "if a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips *sharply* in the plaintiff's favor,' and the other two *Winter* factors are satisfied."  *All. for the Wild Rockies v. Peña*, 865 F.3d 1211, 1217 (9th Cir. 2017) (emphasis in original) (quoting *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013)).

1.  <u>Irreparable Harm</u>

Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages.  *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).  The harm must be likely to occur not merely possible.  *Winter*, 555 U.S. at 22.  Where, as here, the threat alleged is sufficiently serious the requisite likelihood of harm is lowered.  *See, e.g.*, *Roman v. Wolf*, 977 F.3d 935, 944 (9th Cir. 2020) (finding likelihood of irreparable harm based on risk of death from COVID-19 which was approximately one percent at that time according to the Center for Disease Control and Prevention).

United States District Court
Northern District of California

1    As detailed, above, Plaintiffs allege serious risk of harm caused by the imposition of

2    isolated camping by unhoused persons as prescribed by the Ordinance.  These harms include

3    increased risk of psychological harm from isolation; exacerbation of drug use, enhanced risk of

4    drug overdose, and possibly death in the absence of intervention by neighbors; exposure to sexual

5    and domestic violence and human trafficking; and at the very least a credible fear in those

6    previously victimized.  "[T]he threat of physical danger and harm absent injunctive relief qualifies

7    as irreparable." *Al Otro Lado, Inc. v. Mayorkas*, 619 F. Supp. 3d 1029, 1041 (S.D. Cal. 2022)

8    (citing *Leiva-Perez v. Holder*, 640 F.3d 962, 969 (9th Cir. 2011).  *See also Sacramento Homeless*

9    *Union v. Cnty. of Sacramento*, 2022 WL 4022093, at *8 (E.D. Cal. Sept. 2, 2022) (exposure to

10   excessive heat due to clearing of an encampment during a heat wave presented irreparable harm);

11   *L.A. All. for Human Rights v. City of L.A.*, 2020 WL 2615741 (C.D. Cal. May 22, 2020) *vacated*

12   *per stipulation*, 2020 WL 3421782 (C.D. Cal. June 18, 2020) (exposure to toxic fumes and

13   hazardous waste was irreparable harm).

14   The City argues, however, that Plaintiffs have "simply not shown that they will suffer such

15   harms merely by being required to distance their campsites 200 feet from one another."  Docket

16   No. 24 at 30.  Defendants also note that the City's regulations do not disallow multiple people to

17   camp together in one campsite, abating risks.  *Id.* at 31.

18   Plaintiffs outline the importance of having campers in close proximity.  Plaintiffs include

19   women who rely on camping next to other people they trust to deter instances of domestic

20   violence, rape, and other gender-based crime.  Docket No. 1-3, Huff Decl., Ex. J ¶¶ 8–11; Docket

21   No. 1-4, Mendoza Decl., Ex. N ¶¶ 15, 17.  As Plaintiff Shaleeta Boyd explained in her testimony,

22   there are no locks on tents, and they can be cut open; being a woman in this situation is terrifying.

23   Plaintiffs similarly rely on camping near others to deter theft—including of important items such

24   as medical machines.  *See* Docket No. 1-2, Nelson Decl., Ex. C at 75.  Indeed, Plaintiff Shaleeta

25   Boyd suffered theft when camping away from the large MCP encampment but did not have items

26   stolen once she moved closer to a larger cluster of tents along the Path.[5]  Plaintiffs with physical

27

28   _____
[5] While Ms. Boyd lacks standing her testimony exemplifies the harm other Plaintiffs face if the Ordinance goes into effect.

disabilities rely upon nearby campers to get access to food, water, and other resources.  *See, e.g.*, Docket No. 1-3, Aardalen Decl., Ex. I ¶¶ 11–12.  Other Plaintiffs rely upon nearby campers to help them in emergency situations, including in the event of overdose.  *See* Docket No. 1 ¶¶ 92–97; Docket No. 1-3, Aardalen Decl., Ex. I ¶ 6; Docket No. 1-2, Nelson Decl., Ex. F ¶¶ 10–12. Indeed, Plaintiff Aardalen was saved from an accidental overdose by a nearby camper.  Docket No. 1-3, Aardalen Decl., Ex. I ¶ 6; Docket No. 1 ¶ 92.  And at oral argument, Plaintiffs explained that another camper recently suffered an epileptic seizure but was helped by a person camping nearby.

The Ordinance effectively limits campsites to one or two campers.  While the Ordinance theoretically allows more than one person per campsite, it limits the size of each campsite to 200 square feet and requires all belongings be stored therein or discarded.  *See* SMC §§ 19.50.040(C)(2), 19.50.020, 19.50.040(C)(2)(a)–(b).  This effectively limits the number of campers per campsite to two persons.  The Ordinance recognizes that 100 square feet is the benchmark for an individual camper.  *See* SMC §§ 19.50.040(C)(2), 19.50.020 ("A camping area occupied by one person shall not exceed 10ft. by 10ft., (100 sq. ft. total), inclusive of camp facilities, camp paraphernalia, and personal property.").  Though the Ordinance phrases the square footage in terms of maximum size, the benchmark reflects an estimation of a common size of an existing, single-person campsite.[6]  Further, Chief White testified that fire risks are posed by cooking or having any source of radiant heat next to a tent.  Crowding more than two persons within 200 square feet, along with their belongings and cooking apparatuses, increases the risk of fire posed to a campsite's occupants.  Although the Court makes no ruling on this record as to whether allotment of less than 100 square feet is habitable for a single camper, having more than two persons within 200 square feet could well present a significant risk to safety.[7]

---

[6] This estimation of 100 square feet per camper is in line with, though slightly below, that of the U.S. Forest Service's estimation of a typical campsite space, which is 10 by 12 feet or 120 square feet.  *See Accessibility Guidebook for Outdoor Recreation and Trails*, USDA, U.S. FOREST SERVICE (April 2006) https://www.fs.usda.gov/t-d/pubs/htmlpubs/htm06232801/page15.htm.

[7] There is a further problem with the square footage for campsites.  The City assumes, in counting the number of campsites that are available in San Rafael under the Ordinance, that many campsites will be comprised of 50 square feet.  *See* Docket No. 74, Ahuja Decl., ¶ 5.  At oral argument,

United States District Court
Northern District of California

Thus, in effect, the Ordinance limits encampments to one to two persons, separated by at least 200 feet. Separating solo campers or a pair of campers by 200 feet between campsites prevents this vital proximity; 200 feet is over half of a football field, limiting the ability of a neighbor to know of or respond to a drug overdose or to act as a deterrent to thefts or gender-based violence. This distance dilutes the effect of collectiveness that affords mutual protection and support discussed above.

The expert report submitted by Dr. Schonberg summarizes the harm caused by the Ordinance because of its "explicit focus on isolating unsheltered people into small, decentralized campsites." Docket No. 1-3, Ex. K. Schonberg Decl. ¶ 14. This isolation is detrimental because "the single largest risk factors for overdose is using in isolation," and because limited access to "capable guardians" is a key factor in likelihood of victimization of unhoused women. *Id.* ¶¶ 1–3, 13, 19–24. Further, the Ordinance reduces the number of proximate people that can offer help and pool resources. *Id.* ¶ 15. Access to limited resources also increases the need to stray from camp, exposing unhoused women to attacks by strangers. *Id.* ¶¶ 15–16. Dr. Schonberg further explains that establishing a larger network of relationships based on reciprocating favors and obligations is vital to unhoused people, and this network of support would be hindered under the statute. *Id.* ¶¶ 14, 18. Ultimately, Dr. Schonberg concludes that "communities of more than two, isolated peoples are essential for survival." *Id.* ¶ 18.

Accordingly, the Ordinance imposes the kind of isolation (*i.e.*, campsites comprised of only two, isolated people) which presents the substantial risk of harms posed by isolation described by the Plaintiffs and Dr. Schonberg.

And these harms are not speculative, as the City alleges. Specifically, as to drug overdose, the City argues that "Plaintiffs have not shown that ***any*** of them are individually at risk for [death due to drug overdose], which is entirely speculative." Docket No. 24 at 31 (emphasis in original).

---

counsel for Defendants estimated that at least half of the available campsites in San Rafael are limited to 50 square feet. At the same time, at the hearing, the City's counsel indicated that it expected most campsites would be permitted to occupy 100 square feet. This raises a question of how many camp sites which accommodate 100 square feet per camper are truly available. The record is unclear.

United States District Court
Northern District of California

1    However, one Plaintiff was recently saved from an accidental drug overdose by a nearby camper.

2    Docket No. 1-3, Aardalen Decl., Ex. I ¶ 6; Docket No. 1 ¶ 92.  Another Plaintiff saved numerous

3    lives of others at Camp Integrity by administering adrenaline during overdoses.  Docket No. 1-2,

4    Nelson Decl., Ex. F ¶¶ 10–11.  At oral argument, Plaintiffs explained that yet another overdose

5    recently occurred at the encampment, prompting emergency response from nearby campers.

6    Given that Plaintiffs have already saved and been saved, the prevalence of drug addiction among

7    the unhoused as reflected in the testimony of Dr. Schonberg, and the assessment of Dr. Schonberg

8    as to risk of overdose, the risk of harm is not "entirely speculative" as Defendants assert.  Docket

9    No. 24 at 31.  And for reasons stated above, the risk of physical and psychological harm to victims

10   of sexual and domestic violence resulting from isolation is not speculative based on the record

11   thus far.  Nor is the harm to those with disabilities who rely on others for assistance speculative.

12        In addition to the physical harms that Plaintiffs face under the Ordinance due to isolation,

13   Plaintiffs also face severe instability and uncertainty under its enforcement.  Namely, and as

14   discussed in detail below, campers lack notice and clarity as to what space remains available to

15   them for camping.  Although the City provided a map outlining available campsites, this map does

16   nothing to show which areas are already occupied; a Plaintiff could manage to transport all their

17   items to a camping-permissible area, only to learn it is already housing other campers.  Further,

18   without any sort of allocation or designation process, Plaintiffs are subject to eviction and even

19   criminal prosecution if a third party sets up a campsite impermissibly close to Plaintiffs' tents.

20   Thus, even if Plaintiffs find an unoccupied space to camp, Plaintiffs face a never-ending threat of

21   displacement and criminal prosecution at no fault of their own.

22        Finally, and in addition to the above harms, the Ordinance presents irreparable harm to

23   Plaintiffs because of the potential constitutional injuries posed as discussed below.  The Ninth

24   Circuit has recognized that "an alleged constitutional infringement will often alone constitute

25   irreparable harm." *Associated Gen. Contractors of Cal., Inc. v. Coal. of Econ. Equity*, 950 F.2d

26   1401, 1412 (9th Cir. 1991).  As discussed below, Plaintiffs here have set forth meritorious claims

27   as to violations of their constitutional rights under the Fourteenth Amendment among other federal

28   statutes.

United States District Court
Northern District of California

1     Accordingly, Plaintiffs have made an adequate showing that the Ordinance exposes them

2  to serious, irreparable harm. *See Winter*, 555 U.S. at 22.

3        2.    <u>Balance of Hardships</u>

4     If the Court were to consider only a choice between enjoining the enforcement in toto and

5  denying any injunctive relief,  the balance of hardships would tilt slightly but not decidedly in

6  favor of Plaintiffs, in view of the substantial concerns of the City with the current encampment.

7  There is a serious risk of hardship and harm to Plaintiffs if injunctive relief were denied in whole,

8  including risk of grave bodily injury (rape, domestic violence, and other forms of victimization),

9  malnourishment, and even death. *See, e.g.*, Docket No. 1-3, Schonberg Decl., Ex. K ¶¶ 1–24;

10  Docket No. 1-3, Huff Decl., Ex. J ¶¶ 8–11, Docket No. 1-4, Mendoza Decl., Ex. N ¶¶ 15, 17,

11  Docket No. 1-3, Aardalen Decl., Ex. I ¶ 6; Docket No. 1 ¶ 92,  Docket No. 1-2, Nelson Decl., Ex.

12  F ¶¶ 10–12.  However, there are substantial health and safety risks to the City were the Court to

13  grant a complete injunction, leaving the encampment as-is.  Indeed, the encampment has grown

14  since the onset of the litigation, as has accumulated waste and refuse in the area.  Docket No. 25,

15  Montes Decl. ¶ 5; Docket No. 27, Murphy Decl. ¶ 12.  The testimony of City officials by way of

16  declaration and at oral argument establishes that there are fire risks posed by the encampments that

17  are difficult to mitigate. *See* Docket No. 15; White Decl. ¶¶ 2–5.  There has also been an increase

18  in safety calls and criminal activity at the encampment, incidents of harassment against

19  neighboring businesses and workers, and threats posed to students wishing to utilize the path to

20  get to school.  Docket No. 28, Huber Decl. ¶¶ 4–10, 12, 16.  Further, larger encampments can pose

21  an "interior-exterior" problem where tents on the exterior act as a barrier to internal areas,

22  promoting criminal activity on the interior and hindering emergency responders from getting into

23  the camp – although there is no specific evidence this is the case with the current configuration of

24  Camp Integrity. *Id.* ¶ 16.  Ms. Murphy testified that, in a similar vein, large encampments come

25  with a sense of lawlessness.  In short, the City faces substantial hardship if an injunction fully

26  enjoins the Ordinance;  the Plaintiffs face substantial hardships if no injunction issues and the

27  Ordinance is fully enforced.

28     However, a more limited injunction narrowly tailored to the interests of the parties could

be issued which requires the City: (1) to permit clusters of up to four persons, occupying up to 400 square feet, separated by a distance of 100 feet; (2) to adopt a system of designating and allocating campsites; (3) to offer limited support in case of relocation including transportation to the new site upon eviction, and provision of new tents if the existing structure cannot be transported or accommodated at the new site; and (4) to prevent relocation of an individual who has requested an accommodation on account of disability until the City has engaged in the interactive process with that individual.  "When deciding whether to issue a narrowly tailored injunction, district courts must assess the harms pertaining to injunctive relief in the context of that narrow injunction." *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1022 (9th Cir. 2009).   Under such a limited injunction, the balance of hardships shifts.

Under the narrower injunction, much of the harm imposed upon the City is eliminated.   Requiring that four persons be permitted to exist within 400 square feet, but permitting enforcement of the Ordinance generally, allows the City to abate nearly all harm posed by encampments.  As to the risk of fire, Chief White testified at oral argument that the bigger the encampment the greater the risk of fire.  Conversely, allowing the City to pare down the MCP encampment from sixty-or-so tents to a cluster of four would substantially mitigate the risk of fire. Allowing 400 square feet instead of 200 square feet per campsite also provides fire safety benefits. Specifically, Chief White testified that housing four tents within 200 square feet would pose risk of fire, yet there is no limit on the number of campers or tents per campsite under the Ordinance. Accordingly, permitting 400 square feet for four persons would temper risk of fire by allowing some space amongst tents and between tents and ignition sources within a given campsite.[8]

As to criminal activity and safety concerns, applying the City's logic that criminal activity and safety issues grow commensurately with the encampment, Docket No. 28, Huber Decl., ¶ 4 ("As an encampment grows in size, the opportunity for conflict within the encampment between

---

[8] Further, increasing the square footage would allow campsites to remain accessible by leaving space for clear floor or ground space around the tents. *See Accessibility Guidebook for Outdoor Recreation and Trails*, USDA, U.S. FOREST SERVICE (April 2006) https://www.fs.usda.gov/t-d/pubs/htmlpubs/htm06232801/page15.htm ("A minimum 48-inch (1,220-millimeter) clear floor or ground space must be provided on all sides of the tent [and] on tent pads and platforms that are required to be accessible.").

28

encampment members and with the surrounding public increases exponentially."), it follows that reducing an encampment from sixty-or-so tents to four would vastly reduce the concerns regarding criminality and safety.  Separately, Ms. Murphy testified that large encampments come with a sense of lawlessness.  However, there is nothing in the record to show that four tents within a 400 square foot space compared to four tents within a 200 square foot space would pose increased lawlessness.  Finally, there can be no "interior-exterior" problem in a four-tent cluster because, as a matter of geometry, each tent would be on the exterior.  Thus—an injunction requiring 400 square feet per campsite imposes little, if any hardship upon the City, and serves to reduce fire risks.  For Plaintiffs, however, this difference is meaningful.  Namely, it ensures that Plaintiffs can remain in groups of three to four, which is essential for survival, without having to crowd into the space in a way that is unsafe.

Nothing in the record suggests requiring a 100-foot buffer between campsites instead of a 200-foot buffer would interfere with any of the health and safety goals of the City.  As a general matter, the City's goal is to break up large, highly concentrated encampments.  *See* Docket No. 24 at 34.  Imposing a 100-foot buffer (one-third of a football field) between campsites that contain one to four campers achieves that goal.  Further, as to fire safety, Chief White testified at the evidentiary hearing that 100 feet between tents is a good fire buffer.  Another of the City's concern is that debris tends to accumulate between tents if they are placed close together.  However, the Ordinance allows the City to clear items left beyond the bounds of each campsite.  SMC § 19.50.040(C)(2)(b) ("Items stored, kept, discarded, or otherwise existing outside of the camping area shall be presumed to be unattended personal property or trash or debris and may be stored or discarded according to city policy.").  Given that 100 feet is a substantial distance, any items left or discarded between campsites remain easily identifiable as distinct from the campsite and can be cleared by the City as appropriate.

Importantly, at oral argument, counsel for Defendants conceded that it could not identify any meaningful difference for the City in imposing a buffer of say 150 feet compared to 200 feet in abating crime or other concerns posed by large encampments.  To be sure, at some point the reduced distance between tents would cease to "break up" the large encampment.  But there is

1  nothing in the record to suggest that 100 feet, like 150 feet, is meaningfully different from 200 feet

2  in accomplishing the City's goals.  Indeed, the Ordinance utilizes a 100-foot buffer between

3  campsites and playgrounds, 19.50.030(A)(4), implying that 100 feet is indeed a sufficient buffer

4  around a given campsite.  All in all, imposing a 100-foot instead of a 200-foot buffer would not

5  impose any significant hardship upon the City.  On the other hand, the Plaintiffs' hardships would

6  be greatly reduced by this change.  Specifically, a 100-foot buffer, instead of 200-foot buffer

7  allows campers to remain in shouting distance of one another and allows neighboring campers to

8  keep a watchful eye on each other's campsites—both which are helpful in an emergency and for

9  deterrence purposes.

10       Accordingly, under this limited injunction, the hardships imposed upon the City are

11  greatly reduced in terms of the health and safety risks that are posed by encampments.

12       To be sure, the City resists establishing some kind of orderly means of allocating camping

13  sites.  *See* Docket No. 72 at 16.  Particularly, the City's counsel and Ms. Murphy expressed at oral

14  argument that the City does not want to be viewed as having sanctioned camping in any area.

15  However, the City has not demonstrated that adopting an allocation process is not feasible or

16  administrable.  Other cities wishing to enforce anti-camping measures have been able to do so.

17  Indeed, at oral argument counsel for the San Rafael Homeless Union explained that such an

18  approach was effectively taken by the cities of Novato and Sausalito.  *See also Sausalito/Marin*

19  *Cnty. Chapter of Cal. Homeless Union v. City of Sausalito*, 522 F. Supp. 3d 648, 652 (N.D. Cal.

20  2021), *modified in part sub nom. Sausalito/Marin Cnty. Chapter of Cal. Homeless Union v. City of*

21  *Sausalito*, No. 21-CV-01143-EMC, 2021 WL 2141323 (N.D. Cal. May 26, 2021) (relocating

22  campers from one park to allocated spaces set up in a nearby park).  And the notion that the City

23  might be seen as officially sanctioning camping by the unhoused is illusory, as this action would

24  be ordered by the Court, not enacted by the City.

25       Under this arrangement, the balance of hardships imposed upon Plaintiffs in the absence of

26  injunctive relief, compared to the hardships imposed upon Defendants under a limited injunction

27  tips *sharply* in Plaintiffs' favor.  *See Ahlman v. Barnes*, 445 F. Supp. 3d 671, 693 (C.D. Cal. 2020)

28  ("Faced with . . .  preventable human suffering, the Ninth Circuit has little difficulty concluding

that the balance of hardships tips decidedly in plaintiffs' favor."); *Sacramento Homeless Union*, 2022 WL 4022093, at \*6 (city's interests were "far outweighed by the Plaintiffs' interest in their own health and welfare");  *Le Van Hung v. Schaaf*, 2019 WL 1779584, at \*7 (N.D. Cal. Apr. 23, 2019) (residents of encampments are members of the community, and "their interests, too, must be included in assessing the public interest").

      Thus, a limited injunction is warranted if Plaintiffs raise at least "serious questions" on the merits of their legal claims, and if the injunction is supported by the public interest.

      3.    <u>Likelihood of Success or Serious Questions as to the Merits</u>

      Plaintiffs assert claims including violation of the Fourteenth Amendment "state-created danger" doctrine, Due Process, Americans with Disabilities Act ("ADA"), and the Eighth Amendment.  Plaintiffs raise at least "serious questions" under the Fourteenth Amendment "state-created danger" doctrine and due process clause and under the ADA.

      a.    <u>Fourteenth Amendment state-created danger</u>

      The Ninth Circuit recognizes a substantive due process violation under the Fourteenth Amendment where a state actor "affirmatively place[s] an individual in danger by acting with deliberate indifference to [a] known or obvious danger in subjecting the plaintiff to it." *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1062 (9th Cir. 2006).  Deliberate indifference exists where the defendant "disregard[s] a known or obvious consequence of [its] action." *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 974 (9th Cir. 2011).

      The City argues that, as a threshold matter, Plaintiffs' claim is not viable because it rests upon prospective harm (as opposed to retrospective harm) and a legislative act (as opposed to conduct by an individual state actor).  These arguments fail at this preliminary stage of litigation.

      The Ninth Circuit has recognized a viable state-created danger claim where the plaintiff fears future harm and seeks prospective, injunctive relief.  Specifically, the Ninth Circuit has held that "[t]he state-created danger doctrine may also be invoked to enjoin deportation" where the plaintiff faces risk of torture or harm in their home country. *Morgan v. Gonzales*, 495 F.3d 1084, 1093 (9th Cir. 2007) (citing *Wang v. Reno*, 81 F.3d 808, 818-19 (9th Cir. 1996)).  In *Wang*, the court granted such an injunction to prevent the deportation of the plaintiff where he faced a high

1  likelihood of harm at the hands of the Chinese government based upon the United States

2  government's act.  81 F.3d t 818–19. *Cf. Hernandez v. Barr*, 804 F. App'x 566, 569 (9th Cir. 2020)

3  (no state-created danger by deportation where harm upon return was not sufficiently likely).

4  There is no basis for the proposition that a party threatened with real harm stemming from a

5  constitutional violation, must await a violation and injury and then sue for retrospective damages,

6  rather than sue prospectively to prevent it, so long as the requisites for standing for injunctive

7  relief are met.  In this regard, the due process against the infliction of state created danger is no

8  different from other constitutional rights.

9         It is therefore not surprising that this Court has rejected the argument that such claims

10  cannot rest upon future harms.  *Navarro v. City of Mountain View*, 2021 WL 5205598, at *5 (N.D.

11  Cal. Nov. 9, 2021) (finding plausible state-created danger claim premised upon future harms

12  imposed by anti-parking Ordinance enforced against the unhoused).  And thus, this Court and

13  others regularly grant prospective, injunctive relief to prevent such future harm.  *Sacramento*

14  *Homeless Union*, 617 F. Supp. 3d at 1198–99 (enjoining clearing of encampment during extreme

15  heat waved based upon risk of harm, *i.e.*, heat-related illness or death); *Santa Cruz Homeless*

16  *Union v. Bernal*, 514 F. Supp. 3d 1136, 1143, 1146 (N.D. Cal. 2021) (enjoining enforcement of a

17  COVID-19 Executive Order allowing closure and clearing of homeless encampment based upon

18  greater risk of contracting the virus); *Mary's Kitchen v. City of Orange*, 2021 WL 6103368, at

19  *11–12 (C.D. Cal. Nov. 2, 2021) (enjoining eviction of kitchen feeding homeless during period of

20  strong winds and harsh winter based upon risk of harm to homeless population); *Jeremiah v.*

21  *Sutter Cnty.*, 2018 WL 1367541, at *5–6 (E.D. Cal. Mar. 16, 2018) (enjoining enforcement of

22  anti-camping Ordinance during winter months based upon risk from cold weather upon eviction).

23         Further, the Ninth Circuit has not limited application of the doctrine to tortious behavior of

24  individual state actors.  Rather, the Ninth Circuit has recognized that a state-created danger claim

25  may rest on city-wide policy, so long as the harm posed is sufficiently particularized to a group of

26  plaintiffs.  *See, e.g.*, *Sinclair v. City of Seattle*, 61 F.4th 674, 681 (9th Cir. 2023) (recognizing

27  viability of state-created danger claim based upon policy adopted by the city in face of mass

28  protests ("CHOP") but finding no state-created danger where plaintiff failed to show particularized

United States District Court
Northern District of California

32

harm to plaintiff).[9]  In *Sinclair*, the court distinguished *Hunters Capital LLC v. City of Seattle*, another CHOP case, that found plaintiff stated a state-created danger claim. 499 F. Supp. 3d 888, 902 (W.D. Wash. 2020).  The *Sinclair* court explained that in *Hunters Capital*, the plaintiffs involved a group that lived or owned businesses within the CHOP zone, "significantly narrowing the class of persons exposed to the alleged state-created danger," meeting requirements of particularity.  *Sinclair*, 61 F.4th at 683 (citing *Hunters Capital*, 499 F. Supp. at 902).

District courts in the circuit have found that a state-created danger claim can support the enjoinment of city ordinances and eviction actions against homeless persons.  *See, e.g., Navarro*, 2021 WL 5205598, at *5 (denying motion to dismiss state-created danger claim seeking enjoinment of anti-parking ordinance preventing parking RVs); *Jeremiah*, 2018 WL 1367541, at *5 (enjoining anti-camping ordinance based on state-created danger doctrine).

Accordingly, the question is whether Plaintiffs have shown sufficient levels of particularity to render their state-created claim viable.  Here, the facts are very similar to those in *Navarro*, where this Court found sufficient particularity as to a class of unhoused persons impacted by an anti-parking ordinance.  2021 WL 5205598, at *5.  The Court there distinguished the case from *Bologna v. City and County of San Francisco*, where Judge Illston declined to apply the doctrine to the entire "population of a city."  2009 U.S. Dist. LEXIS 69985, at *16 (N.D. Cal. Aug. 11, 2019).  Rather, the doctrine applies "when a state actor creates a risk that is specific to a small group of individuals, rather than to the general public."  *Navarro*, 2021 WL 5205598, at *5.

Here, unlike in *Sinclair* where the city's CHOP policy impacted all city residents equally, the Ordinance poses dangers specific to unhoused persons at Camp Integrity and who have standing as discussed above.  61 F.4th at 683.  This is more like *Hunters Capital*, where the

---

[9]  *See also Henry A. v. Willden*, 678 F.3d 991, 1003 (9th Cir. 2012) (finding claim asserting systemic policies and failure to train by municipality could support state-created danger claim but affirming dismissal with leave to amend to cure errors in complaint);  *Brazda v. City of Reno,* 105 F.3d 664 (9th Cir. 1997) (implicitly recognizing state-created danger claim may rest on policy of City Police Department by finding claim failed because plaintiff did not offer evidence to support the policy's existence); *Pleasant v. Miranda*, 2022 WL 2304221, at *2 (9th Cir. June 27, 2022) (finding that city custom of allowing deputies to give courtesy ride to plaintiff did not support state-created danger claim because the harm did not occur during the ride and thus did not cause the danger posed).

plaintiffs included a narrow subset of the population (people who lived or owned businesses in the CHOP area) than like *Sinclair*. *Id.* (citing *Hunters Capital*, 499 F. Supp. 3d at 902). Further, in *Sinclair* the Ninth Circuit found it relevant that the city had never known of the plaintiff before the harm befell him in finding lack of particularity. 61 F.4th at 682. Dissimilarly here, the City's mental health liaison, Lynn Murphy, knows the Plaintiffs and has interacted with them on several occasions. *See* Docket No. 27, Murphy Decl ¶ 24. Defendants have taken several trips to the MCP encampment. *See* Docket No. 71. And further, the City Council Agenda Report proposing adoption of the Ordinance at issue specifically discussed the MCP encampment in recommending the Ordinance be adopted. *See* Docket. No. 16-2 at 3–6. Thus, there is a particularized danger and action directed at Plaintiffs here. Given that the relief Plaintiffs seek has not been foreclosed by the Ninth Circuit, there is no threshold per se bar to Plaintiffs' claims at this preliminary injunction phase.

Turning to the substance of Plaintiffs' claim: there is substantial evidence in the record establishing that the City's new statutory scheme places Plaintiffs in danger of sexual and domestic violence, victimization as to crime, death due to drug overdose, and inability to access food, water, and shelter. Docket No. 32-6, Schonberg Supp. Decl. ¶¶ 7–27. The statute is expected to increase drug overdose deaths by 15-25% in San Rafael because of the risks posed by using in isolation and other consequences of breaking up encampments, including involuntary displacement. *Id.* ¶¶ 21–25 (citing Barocas et al., *Population-Level Health Effects of Involuntary Displacement of People Experiencing Unsheltered Homelessness Who Inject Drugs in US Cities*, JAMA (2023)). Unhoused women face a significant increase of violence under the Ordinance. *Id.* ¶¶ 23–27. Dr. Schonberg concludes that "communities of more than two, isolated peoples are essential for survival," which as explained above is not truly viable under the Ordinance. *Id.* ¶ 18. Further, the Ordinance stands to destabilize the communal frameworks on which individuals rely for survival due to the need to self-police a large area around each campsite and hinders exchange of informal social capital. *See* Docket No. 32-12, Sarris Decl. ¶ 9(c).

In addition to the evidence presented by Dr. Schonberg, Mr. Sarris, and the testimony of the individual Plaintiffs, the City's mental health liaison, Lynn Murphy, conceded at oral

United States District Court
Northern District of California

argument on October 2, 2023, that camping in isolation poses devastating risk to unhoused persons.  And further, Dr. Schonberg testified that a large portion of the unhoused population have vulnerabilities including physical disabilities or substance use or abuse.  This increases the danger posed to this population.

District courts recognize that the clearing of homeless encampments may present a state-created danger claim when residents are exposed to increased risk of harm due to its clearing.  *See, e.g.*, *Janosko v. City of Oakland*, 2023 WL 187499, at *3 (N.D. Cal. Jan. 13, 2023) (finding eviction of residents of encampment during severe rainstorms and pandemic presented serious questions on merits of state-created danger claim, as removing residents would affirmatively expose unhoused to harsher, more dangerous conditions compared to remaining at the camp); *Sanchez v. City of Fresno*, 914 F. Supp. 2d 1079, 1102 (E.D. Cal. 2012) (similar); *Jeremiah*, 2018 WL 1367541, at *5 (similar).

Significantly, the Ninth Circuit has found a due process violation under the state-created danger theory in other contexts where the defendant makes conditions worse for the plaintiff, even where exposure to harm already existed.  *See Martinez v. City of Clovis*, 943 F.3d 1260, 1272 (9th Cir. 2019) (finding state-created danger where officer provoked abuser which led to another instance of domestic violence).  The Ninth Circuit has also held that exposing the plaintiff to crime constitutes a state-created danger.  *See Wood v. Ostrander*, 879 F.2d 583, 590 (9th Cir. 1989) (finding state-created danger where officer impounded the car plaintiff was in and left her alone in high-crime area at 2:30 a.m.).  Similarly, when a state actor cuts off access to life-sustaining resources this may constitute a state-created danger.  *Penilla v. Huntington*, 115 F.3d 707, 710 (9th Cir. 1997) (cancelling call to paramedics where an individual needed medical care constituted substantive due process violation).

With respect to the requirement that the City be determined to act with deliberate indifference, the harms to vulnerable campers described above, including women victimized by violence and those whom require assistance of others, seem obvious.  To the extent they were not apparent to the City, that risk has now been made clear by way of the declarations, reports,

35

testimony, and other evidence presented in this litigation.[10]

To be sure, the Ninth Circuit has yet to definitively rule on the application of the doctrine to situations where a city endeavors to clear homeless encampments, thus leaving the unhoused in more vulnerable and dangerous conditions.  And the Circuit has not addressed the situation where there is specific evidence of substantial risk of harm to vulnerable, unhoused individuals should they be forced into isolated campsites.   *LA Alliance for Human Rights v. County of Los Angeles* addresses the general subject matter of homelessness but does not speak to these precise issues. 14 F.4th  947, 958 (9th Cir. 2021).  There, plaintiffs including business and property owners, landlords, and housed residents of the Skid Row area sued the County for numerous policies and practices regarding homelessness that allegedly resulted in unsafe conditions posed to residents and business owners in the Skid Row area.  *Id.* at 952–53.  The court granted an extensive preliminary injunction requiring, among other things, that the County offer housing to all unhoused persons in the Skid Row area in an effort to clear the encampments and the escrow of one billion dollars to address homelessness.  *Id.* at 955–56  The Circuit overturned the injunction, in part because plaintiffs lacked standing as the injunction was premised upon race-based harms, including state-created danger posed to Black families in the area, yet plaintiffs did not offer evidence establishing their race.  *Id.* at 957–58.[11]

Thus, the contours of the doctrine in the present context remain ill-defined.  Testing its

---

[10] Plaintiffs are not the only ones that have brought harms posed by the Ordinance to the City's attention.  In a letter penned by some members of the Lived Experiences Advisory Board ("LEAB") on which certain Defendants in this suit sit, to the San Rafael City Council, the LEAB identified numerous harms that the Ordinance would impose upon the unhoused.  Docket No. 32-12, Sarris Decl. ¶¶ 6, 9 & Ex. A ("[W]e have found the ordinance unacceptable and contrary to requirements [of the] United States Interagency Council on Homelessness.").  The LEAB further implored the San Rafael City Council to engage in mitigation efforts, including designating sanctioned encampments and offering central locations for support.  *Id.* ¶¶ 5–7. Such a collaborative approach has been taken by the City of Novato, for example, and would serve to mitigate the harm to Plaintiffs while meeting needs of the City.  The City has declined to engage in such efforts, supporting a finding of deliberate indifference. *See Polanco v. Diaz*, 76 F.4th 918, 926 (9th Cir. 2023) (finding transfer of inmates during pandemic while declining to engage in mitigation efforts presented a state-created danger).

[11] Though not precisely on point, *LA Alliance for Human Rights* implicitly recognizes that a state-created danger claim based upon policies and practices pertaining to the homeless is viable, provided plaintiffs have standing and the remedy redresses the harms. 14 F.4th at 958.

United States District Court
Northern District of California

36

outer limits, the City asks whether the doctrine would prevent eviction of a squatter who would be forced out into the elements upon eviction.  Docket No. 72 at 11.  (The City does not posit the additional scenarios of whether the state might bear some constitutional responsibility if, for example, the squatter is forced out into subzero temperatures with no available shelter.)  Such a hypothetical raises the question, *inter alia*, what is the appropriate baseline by which to measure whether the state has caused an increase in danger?  That question is raised inferentially here: since this suit was filed, more campers have joined the MCP encampment.  The precise baseline is not entirely clear.  *Cf. Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1060–61 (9th Cir. 2014) (defining the "status quo" amongst parties for purposes of a preliminary injunction as the "legally relevant relationship between the parties before the controversy arose").  While some residents of the MCP may have stronger claims of endangerment than others, the Ordinance treats all residents the same, disregarding the dangers it poses particularly to those who are especially vulnerable;  it sets forth no real procedures to determine who needs to be accommodated and how their need to be free from serious danger can be met.  The Ordinance ignores the realities facing each individual and instead imposes a blanket restriction on density which effectively isolates unhoused campers regardless of their needs.

In summation, although the contours of the doctrine in this context have not been decided by the Ninth Circuit, the cases thus far decided by the Circuit establish the general due process proposition advanced by Plaintiffs.  Given the logic of the doctrine and the body of district court cases applying it to similar situations involving the treatment of unhoused individuals and groups, the Court concludes the Plaintiffs have raised at least serious questions on the merits of this due process claim at this preliminary juncture.

b.    Americans with Disabilities Act

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Its implementing regulations require state agencies to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid

discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130(b)(7)(i).

Plaintiffs establish that the statute forces them to camp in ways that are incompatible with their disabilities including physical injury, PTSD from childhood sexual trauma, sleep apnea, and schizophrenia.  Docket No. 1 ¶¶ 76–88.  To this end, Plaintiffs Amalia Mendoza, Brian Nelson, Christie Marie Cook, and Anker Aardalen submitted Requests for Reasonable Accommodations to the City.  *See* Accommodation Requests.  In addition to requesting housing, Plaintiffs request the ability to camp near others.  *Id.*  Namely, Plaintiff Amalia Mendoza attests that because of her past childhood sexual trauma and PTSD she cannot sleep unless she is close to multiple other people that she trusts.  Docket No. 1-4, Mendoza Decl., Ex. A at 22–23; Docket No. 1 ¶ 82.  This provides protection and prevention of mental health episodes.  Docket No. 1-4, Mendoza Decl., Ex. A at 22–23.  Mr. Aardalen has a dislocated knee and needs nearby caretakers to get access to food and water because he cannot walk easily.  Docket No. 32 ¶¶ 79, 86.  Further, Mr. Nelson has sleep apnea and requires use of a "CPAP" machine, and thus needs access to electricity.  Docket No. 1-2, Nelson Decl., Ex. C.  Mr. Nelson also suffers from PTSD from a stabbing attack he suffered which is aggravated when not near familiar people.  *Id.*  Similarly, Ms. Binkley and Mr. Tringali suffer from anxiety, PTSD, and depression (due to severe domestic violence suffered in the case of Ms. Binkley) that is aggravated by isolation.  *See* Docket No. 77 ¶¶ 87–99, 102.

Defendants argue adjudicating the claim is premature unless and until Plaintiffs submit reasonable requests for accommodation and those requests are denied.  Docket. No. 72 at 12–16.  However, Plaintiffs submitted requests for accommodation in mid-August.  *See* Accommodation Requests.  But the City has not engaged in an interactive process with Plaintiffs despite its policy requiring a response within fifteen days.  Docket No. 72-2, Jeppson Decl. ¶ 2(b).  The refusal to engage in the accommodation process may constitute a denial of a request.  *Whitehead v. Pacifica Senior Living Mgmt. LLC*, 2022 WL 313844, at *2 (9th Cir. Feb. 2, 2022) (finding that in the context of the Fair Employment and Housing Act, "[a]n employer's refusal to engage in good faith in an interactive process with the employee to provide the requested accommodation" may violate

the Act); *Groome Res., Ltd. v. Par. of Jefferson*, 234 F.3d 192, 197–98 (5th Cir. 2000) (finding inaction and delay in context of considering accommodation to Fair Housing Act may constitute denial); *McCray v. Wilkie*, 966 F.3d 616, 621 (7th Cir. 2020) (holding delay in providing accommodation in the employment context can amount to failure to accommodate).

Furthermore, the Ordinance makes no specific or special recognition of the unhoused and the urgency of their need for accommodation should they be faced with imminent eviction from the current campsites which are accommodating their needs. Relying solely on the current ADA grievance process which, taking it through the internal appeals process, could take two months or more, does not address the specific needs of those facing an imminent housing crisis.

On the merits of this claim, there is a threshold issue of what constitutes a "program" within the meaning of the statute and whether Plaintiffs' disabilities are impacted by the Ordinance. Defendants argue that there is no "program" here giving rise to an ADA claim. Docket No. 16 at 8. However, this argument is incompatible with *Where Do We Go Berkely*, which explained: "the ADA's prohibition on discrimination in public programs 'brings within its scope anything a public entity does,'" including the way that government entities enforce their laws. 32 F.4th 852, 861 (9th Cir. 2022) (citing *Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002)) (clearing of encampment constituted a program under the ADA).

To be sure, the Ninth Circuit in *Where Do We Go Berkeley* made clear that to analyze an ADA claim, the scope and function of the "program" at issue must be clearly defined. 32 F.4th at 861–82. Precisely what constitutes the scope of an applicable "program" appears nebulous. In *Where Do We Go Berkeley*, the court narrowly defined the "program" as clearing "level 1" (*i.e.*, high risk encampments) with "72 hours' notice before clearing and possible coordination with local partners." *Id.* at 862. This definition contrasts with that in *LA Alliance for Human Rights v. County of Los Angeles*, where the court defined the "program" broadly: "Skid Row area sidewalks are a service, program, or activity of the City within the meaning of Title II of the ADA." 14 F.4th 947, 959 (9th Cir. 2021). The scope of the definition of the applicable program informs whether any proposed alternation is fundamental; the broader the definition, the more extensive the alteration for accommodation may be before it may be deemed fundamental.

1          Here, to the extent there is a program – and there undoubtedly is – the City narrowly

2   defines its program as "breaking up the two large, concentrated encampments . . . (Mahon Creek

3   Path and Andersen Boulevard), by giving the occupants several weeks' notice and providing them

4   with relocation assistance and access to support services."  Docket No. 24 at 29.  Even assuming

5   the City's narrow description of its program is appropriate, there are viable modifications available

6   here that can accommodate the ADA needs of disabled campers.  To determine if the modification

7   fundamentally alters the program, the court should consider if it changes the "essential nature" of

8   the program.  *Reed v. City of Emeryville*, 568 F. Supp. 3d 1029, 1043 (N.D. Cal. 2021).  This

9   includes how the modification impacts the goals of the program and if it hinders addressing public

10  risks the program targets.  *See Where Do We Go Berkeley*, 32 F.4th at 862.

11         Allowing smaller tent clusters (four or fewer persons within 400 square feet) maintains the

12  program's central purpose of breaking up *large and highly concentrated* encampments filled with

13  dozens of tents—which is the City's stated focus.  *See* Docket No. 24 at 29.  For example,

14  Lieutenant Huber explains that large encampments are dangerous because they impose a barrier of

15  tents on the outside, creating an inaccessible and unmonitored interior where criminal activity can

16  thrive.  Docket No. 28, Huber Decl. ¶ 16.  Establishing smaller clusters is still congruent with the

17  City's goal and does not pose the same interior-exterior problem of large encampments (since an

18  encampment of four persons cannot by geometric definition have an interior section).  Similarly,

19  Lieutenant Huber testified that the rise of violence, criminality, emergency calls, and impacts on

20  the surrounding community are problematic in "larger concentrated encampments," as compared

21  to "isolated individual or small encampments."  Docket No. 28, Huber Decl. ¶¶ 4, 16.  Likewise,

22  Ms. Murphy defines "smaller encampments," *i.e.*, safer encampments in the City's view as those

23  that are "under four people."  Docket No. 72-5, Murphy Supp. Decl. ¶ 9.  A one-person increase in

24  the number of campers (four vs. three) and increase in square footage to accommodate such

25  clusters (400 square feet vs. 200 square feet) is a minimal adjustment and would be one of degree,

26  and not kind, and certainly is not fundamental alteration.  *Cf. Rose v. Rhorer*, 2014 WL 1881623,

27  at *4 (N.D. Cal. May 9, 2014) (finding automatic extension of shelter bed reservations for disabled

28  would fundamentally alter program from short-term facility for all to long-term facility for the

United States District Court
Northern District of California

40

1    disabled).

2           Finally, Defendants argue that the Plaintiffs have failed to "connect the dots" by showing

3    how Plaintiffs' disabilities are impacted by the "program" or how they have been otherwise

4    discriminated against in its implementation.  Docket No. 16 at 8.  However, Plaintiffs have

5    established that the Ordinance in its present form does not accommodate Plaintiffs' disabilities.

6    Mr. Aardalen who has difficulty walking would be separated from caretakers that bring him food

7    and water.  Docket No. 1 ¶¶ 79, 86.  The Ordinance prevents Ms. Mendoza from sleeping near

8    multiple other people that she trusts to avoid triggering mental health episodes caused by PTSD

9    from sexual trauma.  Docket No. 1-4, Mendoza Decl., Ex. A at 22–23; Docket No. 1 ¶ 82.  Mr.

10   Nelson relies upon a CPAP machine to treat sleep apnea and would not be able to find a source of

11   electricity if separated from his communal encampment.  Docket No. 1-2, Nelson Decl., Ex. C at

12   27–28.  Mr. Nelson, Mr. Tringali, and Ms. Binkley also have asserted that their psychological

13   disabilities including depression, PTSD, and anxiety (caused from prior domestic violence and

14   physical assault) are aggravated by being forced to camp in isolation.  *See* Docket No. 77 ¶¶ 89,

15   90, 103; Docket No. 1-2, Nelson Decl., Ex. C.  Given the evidence of the prevalence of special

16   needs among the unhoused as Dr. Schonberg describes, there are likely others in the camp who

17   require some accommodation.  Thus, the Plaintiffs have shown that their disabilities are impacted

18   by the "program," *i.e.*, the clearing of the encampment.  Nor has the City engaged the Plaintiffs in

19   an interactive process to see what specific accommodations can be afforded.

20          Accordingly, Plaintiffs have raised a serious question as to whether their rights under the

21   ADA would be violated in the absence of at least narrow preliminary injunctive relief requiring

22   that unhoused individuals be allowed to camp in a cluster of up to four people within 100 feet of

23   other encampments and requiring the City engage in the interactive process before enforcing the

24   Ordinance against Plaintiffs.

25                  c.      Fourteenth Amendment due process

26          Plaintiffs also raise additional due process concerns.  First, our jurisprudence recognizes

27   the fundamental maxim that "[g]uilt is personal."  *Scales v. United States*, 367 U.S. 203 (1961).

28   *See St. Ann v. Palisi*, 495 F.2d 423, 425–26 (5th Cir. 1974) (explaining that the due process clause

of Fourteenth Amendment protects an individual's right to be punished only on basis of personal guilt); *Levy v. Louisiana*, 391 U.S. 68 (1968) (denying illegitimate children the ability to pursue wrongful death claims under state statute violates constitution as children are not to be deprived due to the indiscretion of their parents).  Imposing penalties for someone else's conduct conflicts with due process.  In a similar vein, *mens rea* is typically a required element of a crime.  *See Staples v. United States*, 511 U.S. 600, 605 (1994) ("The existence of a *mens rea* is the rule of, rather than the exception to, the principles of Anglo–American criminal jurisprudence.") (citing *United States v. United States Gypsum Co.*, 438 U.S. 422, 436–437 (1978)).  Otherwise, criminal sanctions may improperly be imposed upon persons whose mental state made their actions entirely innocent.  *See id.* at 606–15.

Here, because of the strict density limits imposed by the Ordinance severely restricting where unhoused individuals can camp, the unregulated nature of the designation and allocation of those limited permissible campsites for the unhoused leaves Plaintiffs exposed to being evicted and/or criminally prosecuted as a result of actions taken not by them but by a third party.  *See* SMC § 19.50.040(C)(4).  Specifically, the Ordinance makes it illegal to maintain a campsite within 200 feet of another campsite without limitation.  *Id.*  The City has asserted in its filings and at oral argument that it does not intend to set forth an allocation process, *e.g.*, establishing designated campsites or assigning land on *e.g.* a first-come-first serve or need basis.  *See* Docket No. 72 at 16 ("To be clear, allowable space will *not* be allotted.").  Rather, the unhoused will be left to find space to camp adhering to the specific proximity requirements of the Ordinance on their own, and to self-police the space around their tent to remain compliant.  Thus, unhoused persons are subject to potential eviction or prosecution for violating the Ordinance if a camp is set up by someone else within 200 feet, regardless of consent and even awareness (*e.g.*, if a tent is set up nearby while the person is sleeping or away from camp) of the camper.  While the City simply says if there is a conflict, the police may be called to resolve the conflict, there is no procedural due process attached to that process.  To make matters worse, the City says if the policy cannot determine who is right, both campers will be subject to eviction.  Docket No. 72 at 17.  While the City analogizes this as two people wanting to sit on the same public bench, *see id.*, the decision as

United States District Court
Northern District of California

1    to where one can camp and claim things necessary for survival is far more consequential.  Where

2    the essentials to survival are potentially scarce, the unhoused cannot simply be relegated to a game

3    of musical chairs.

4            There is another due process problem regarding fair notice.  Specifically, without an

5    allocation or registration process the unhoused will not know which spaces remain unoccupied

6    throughout the City because of proximity requirements (relative to both other campers and City

7    structures such as playgrounds) and thus where they can camp lawfully under the Ordinance.  This

8    makes it particularly difficult for persons with health or safety concerns, or limited mobility to

9    find suitable space (*e.g.*, space big enough to house multi-person site, or close to proximity) and

10   avoid violating the Ordinance.  Again, as noted above, this problem can be particularly acute if

11   there is a relative scarcity of available campsites insofar as the number of unsheltered persons in

12   San Rafael is better approximated by the 2022 PIT estimate of 241 unsheltered persons as opposed

13   to the City's current count of 120 unsheltered persons.  *Compare*, Dkt. No. 24 at 5 *with* Docket

14   No. 16-2 at 2–3.

15           For these reasons, Plaintiffs have raised at least "serious questions" as to the merits of their

16   claims that the Ordinance violates constitutional principles of due process.

17                   d.      <u>Eighth Amendment</u>

18           Plaintiffs also assert that SMC section 19.50 violates the Eighth Amendment's Cruel and

19   Unusual Punishment Clause for impermissibly criminalizing involuntary acts and status.  The

20   Eighth Amendment states that, "[e]xcessive bail shall not be required, nor excessive fines

21   imposed, nor cruel and unusual punishments inflicted."  U.S. Const., amend. VIII.  The latter

22   clause has been interpreted as including substantive limits upon what conduct may be

23   criminalized.  *Martin*, 920 F.3d at 615.  Specifically, the state may not criminally punish an

24   "involuntary act or condition if it is the unavoidable consequence of one's status or being."  *Id.* at

25   616.  The *Martin* court explained that "[h]uman beings are biologically compelled to rest," and

26   doing so in public is unavoidable if a person is unhoused and has nowhere else to go.  *Id.* at 617.

27   Accordingly, an ordinance would be unconstitutional "insofar as it imposes criminal sanctions

28   against homeless individuals for sleeping outdoors, on public property, when no alternative shelter

1    is available to them." *Id.* at 604.  In *Grants Pass*, the Ninth Circuit affirmed the holding of

2    *Martin*, and clarified that the protection applied to individuals that are involuntarily unhoused.  72

3    F.4th at 896.

4         Previously, Judge Thompson issued a temporary restraining order to halt the enforcement

5    of the Ordinance, finding that at least "serious questions" were raised as to the merits of Plaintiffs'

6    claim that the Ordinance violates the Eighth Amendment's Cruel and Unusual Punishment Clause,

7    as interpreted by the Ninth Circuit Court of Appeals in *Martin*, 920 F.3d 584.  *See* Docket No. 19.

8    Specifically, the Court found that the anti-camping exception in the ordinance, designating some

9    land as camping-permissible appeared to be non-viable, given the broad categories of exception-

10   prohibited property, lack of clarification by the City as to where camping was permitted, and the

11   requirement that campsites be 200 feet apart to be lawful.  *Id.* at 12–15, 15 n.2.   Subsequently,

12   Defendants submitted a map into evidence identifying camping-permissible land.  Docket No. 74,

13   Ahuja Decl., Ex. A.

14        Under *Martin*, some regulation of camping by the City is permissible so long as there are

15   still areas where the unhoused can sleep throughout the City.  The *Martin* court wrote "we in no

16   way dictate to the City that it must . . . allow anyone who wishes to sit, lie, or sleep on the streets .

17   . . at any time and at any place."  920 F.3d at 617; *see also Sausalito/Marin Cnty. Chapter of*

18   *California Homeless Union v. City of Sausalito*, 2021 WL 5889370, at *2 (N.D. Cal. Dec. 13,

19   2021) ("*Martin* prohibits a ban on all camping, not the proper designation of permissible areas.").

20   Accordingly, courts applying *Martin* find it constitutional to impose geographical limits on

21   camping so long as there is somewhere else that an unhoused person can sleep within city limits.

22   For example, in *Gomes v. County of Kauai*, the court found no *Martin* violation where camping

23   was disallowed in one park in the city.  481 F. Supp. 3d 1104, 1109 (D. Haw. 2020); *see also*

24   *Boring v. Murillo*, 2022 U.S. Dist. LEXIS 198089, at *14–15 (C.D. Cal. Aug. 11, 2022) (finding

25   statute sound if moving unhoused from downtown to residential areas).

26        Section 19.50.030 prohibits camping absolutely in: open space property; public facilities;

27   public rights-of-way; within 10 feet within public utility infrastructure; within 100 feet of

28   playgrounds; City parking garages; and anywhere the City council or City manager designates as a

United States District Court
Northern District of California

44

1    health/safety risk.

2    The exception allowing for camping in all other areas includes no illustrative language.

3    SMC § 19.50.040.  However, the City has submitted a map into evidence identifying where

4    camping remains permissible within the City of San Rafael.  Docket No. 74, Ahuja Decl., Ex. A.

5    The City argues that County land should be considered in determining if there is adequate space in

6    San Rafael for camping.  Docket No. 72 at 7.

7    However, County land is not properly considered in the calculation as the County rejects

8    the City's assertion that County land is regularly available for camping.  *See* Docket. No. 86, Ex.

9    A (Letter from Brian Washington, County of Marin Counsel).  Setting aside County land, the

10   City's map expresses that camp-friendly land in the City, in consideration of the distancing

11   restrictions and features including buildings, playgrounds, and ball fields, allows 262 campsites to

12   be maintained. [12]  *Id.* ¶ 5.  Based on the City's estimate, there are approximately 120 unsheltered

13   persons in the City of San Rafael; however, the City's 2022 PIT survey of Marin County estimated

14   241 unsheltered persons in San Rafael.  *Compare*, Docket No. 24 at 5 *with* Docket No. 16-2 at 2–

15   3.  Under either estimation, there seems to be enough campsites to literally house the unsheltered

16   population in San Rafael, though the City will near its capacity according to the PIT estimation.

17   However, while there appears to be an adequate number of campsites, the matter is not free

18   from doubt.  As noted above, many residents will need to live in a small community of four

19   campers who, according to the evidence, will need, *e.g.*, 400 square feet per campsite.  The City's

20   map does not indicate how many such clusters may be accommodated.  Also, there is a question

21   whether all single campers who need more than 50 square feet may be accommodated, and at this

22   juncture, there is no evidence that 50 square feet is sufficient for all single campers. As discussed

---

[12] The City also argues that the estimation is underinclusive because sidewalks and rights of way remain available but are too numerous to be mapped by the City.  This is not persuasive because the text of the statute provides: "No person or persons shall camp in or on any public right-of-way or sidewalk, ***or portion thereof***, ***or*** in a manner that obstructs, blocks, or otherwise interferes with use of or access to a public right-of-way or sidewalk."  19.50.020(A)(6) (emphasis added).  The City's interpretation that this leaves open camping on portions of sidewalks if not obstructing the path is untethered from its language.  *See, e.g.*, *Wills v. City of Monterey*, 617 F. Supp. 3d 1107, 1120–21 (N.D. Cal. 2022) (finding city's interpretation of sidewalk ordinance was not supported by language used in the statute).

United States District Court
Northern District of California

above, the Court has some skepticism since it appeared that based on experience, 100 square feet is the typical size of the average camper.  As the City indicated at oral argument, more than half of the identified sites will accommodate only 50 square feet of camping.  If the number of unhoused persons in San Rafael is 241 per the PIT estimate, there remains a question whether there are a sufficient number of permissible camp sites for the unhoused in San Rafael.  Nonetheless, the Plaintiffs have not presented any evidence suggesting that the designated campsites are not adequate, and thus the Court finds that at this juncture, the Plaintiffs have not raised serious questions that there is a basic violation of *Martin*, provided the City demonstrates in a revised map, consistent with the conditions imposed, that there are enough campsites for the unhoused.

It should be further noted that district courts applying *Martin* require that land where camping remains available be sufficiently habitable qualitatively to satisfy the Eighth Amendment. In *Warren v. City of Chico*, the court found a temporary shelter facility on an airport tarmac could not be considered alternative shelter sufficient to satisfy the Eighth Amendment.  2021 WL 2894648, at *7–8 (E.D. Cal. July 8, 2021).  The court explained that "[the site is] asphalt tarmac with no roof and no walls, no water and no electricity . . . It affords no real cover or protection to anyone." *Id.*  The Plaintiffs do not raise any specific issues with the areas identified as camp-friendly by the City in Plaintiffs' latest filings.  *See* Docket No. 76 at ¶¶ 21–28.  Thus, based on the present record, Plaintiffs' claims do not raise serious questions as to the merits of a *Martin* claim based upon the quality of camping-permissive land in San Rafael.

However, the Court notes that *Grants Pass* establishes that cities cannot enforce anti-camping ordinances to the extent that they prohibit "the most rudimentary precautions" a homeless person might take against the elements, *i.e.*, bedding or tents. 72 F.4th at 891.  So, while there are not serious questions presented as to the Eighth Amendment claim, there are constitutional concerns imposed to the extent that Defendants plan to confiscate Plaintiffs' tents that do not fit within spaces available under the Ordinance (as modified by this preliminary injunction) without replacing such rudimentary needs as bedding and a tent.  Defendants expressed some willingness to replace tents at oral argument on October 2, 2023, though it is not clear the precise

1    circumstances in which the City intends to do so.[13]

2          4.      Public interest

3          As discussed above, the primary risks imposed upon the public are abated under the

4    Court's narrow injunction which limits encampments to up to a maximum of four persons within a

5    400 square foot area and requires campsites to be separated by 100 feet.  This narrow injunction

6    largely abates risk of fire, increased criminal activity, safety calls, and incidents of harassment to

7    the surrounding public which arguably grow commensurately with the number of tents in an

8    encampment.  *See, e.g.*, Docket No. 28, Huber Decl. ¶ 4 ("As an encampment grows in size, the

9    opportunity for conflict within the encampment between encampment members and with the

10   surrounding public increases exponentially."); Docket No. 72-5, Murphy Supp. Decl. ¶¶ 6–9

11   (similar).  This is also supported by the testimony of Chief White at oral argument that the more

12   tents in an encampment, the greater the fire risk.

13         Conversely, implementation of the Ordinance in full may impair the public's interest.  The

14   statute makes it harder for community organizations to find the unhoused and offer help.  Docket

15   No. 32-12, Sarris Decl. ¶ 9(e).  This may further entrench homelessness in the community.  *Id.*

16   Ms. Murphy recognized this concern, as she testified that unhoused persons rely on Narcan and

17   solar charging stations being distributed throughout campsites, but she could not confirm that the

18   volunteer organizations have the resources to visit dispersed campsites in San Rafael (as opposed

19   to a few, central encampments as they currently stand).  The public also does not benefit from

20   facilitating sexual and domestic violence within its borders.  Further, where, as here, Plaintiffs

21   establish a potential violation of the United States Constitution, "[p]laintiffs have also established

22   that both the public interest and the balance of the equities favor a preliminary injunction" because

23   the public has an interest in upholding the federal law.  *Ariz. Dream Act Coal.*, 757 F.3d at 1069.

24   A narrowly tailored injunction protects the public's interest in helping to provide meaningful

25

26   _____

27   [13] In addition to the above claims, Plaintiffs also assert claims under the Fourteenth Amendment
     void-for-vagueness doctrine, the First Amendment, violation of the Fourteenth Amendment's
     equal protection clause, and an impermissible Bill of Attainder, under U.S. Const. Art. 1 § 9 cl. 3.
28   Given that Plaintiffs have shown serious questions as to certain of their claims, the Court declines
     to address the balance of Plaintiffs' claims at this juncture.

United States District Court
Northern District of California

1    degree of safety and health to some of the City's most vulnerable citizens.  In short, the public

2    interest favors a narrowly tailored preliminary injunction.

3                                   **V.**    **CONCLUSION**

4          Because the Court finds that there is a likelihood of irreparable harm, the balance of

5    hardships tip sharply in Plaintiffs favor, Plaintiffs raise serious questions on the merits of

6    Plaintiffs' Fourteenth Amendment, Due Process, and ADA claims, and the public interest is

7    served by a narrowly tailored preliminary injunction, a preliminary injunction may properly be

8    issued here.

9          Although an injunction is warranted, the Court is careful to issue injunctive relief only as

10   broad as is necessary to remedy the harm posed to Plaintiffs.  *See City & Cnty. of San Francisco v.*

11   *Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018) (injunctive relief should be "narrowly tailored to

12   remedy the specific harm shown").  Accordingly, the Court is prepared to lift the blanket

13   injunction and permit the City to enforce the Ordinance in large part but with some narrow

14   limitations and conditions necessary to prevent irreparable harm and to minimize hardship to both

15   parties.  *See, e.g.*, *Hernandez v. Sessions*, 872 F.3d 976, 999–1000 (9th Cir. 2017) ("[The] infinite

16   variety of situations in which [a] court of equity may be called upon for interlocutory injunctive

17   relief requires that court have considerable discretion in fashioning such relief."); *Cobine v. City of*

18   *Eureka*, 2016 WL 1730084, at *8 (N.D. Cal. May 2, 2016) (allowing enforcement of anti-camping

19   ordinance so long as conditions were met by the city including storage of belongings of unhoused

20   persons and providing emergency shelter); *Sausalito/Marin Cnty. Chapter of California Homeless*

21   *Union v. City of Sausalito*, 2021 WL 5889370, at *4 (N.D. Cal. Dec. 13, 2021) (allowing

22   relocation of encampment by the city provided conditions abating danger, including provision of

23   wooden platforms, afforded).

24         For the reasons stated above, based on the current record, the Court finds that the City

25   may, during the pendency of the litigation or until further ordered, enforce SMC Section 19.50

26   with the following modifications and conditions.  For individual Plaintiffs in this action that have

27   established standing and members of the San Rafael Homeless Union that reside at the Mahon

28   Creek Path encampment, the City must:

United States District Court
Northern District of California

48

- Allow 400 square feet campsites (instead of 200 square feet) housing up to four people.

- Campsites may be separated by 100 feet (rather than a 200-foot buffer.

- To the extent Plaintiffs identified above do not have tents and bedding that can fit within the space compliant with the Ordinance,  the City must provide replacements.

- The City must provide assistance to campers who need to move to a designated space.

- The City must designate the permissible campsites which complies with the Ordinance as modified by this preliminary injunction on street level maps.  The map shall identify each allowable campsite by size and number of allowed occupants.  The City shall also visibly designate at each site, the boundaries of each permissible campsite so that campers will have clear notice in order to comply with the Ordinance.

- The City must establish some kind of allocation and registration process so that there is an orderly process by which campers can find permitted campsites.

- The City shall not evict or prosecute any Plaintiff who has submitted a request for reasonable accommodation based on disability unless and until it completes an interactive process (including administrative appeals) with that Plaintiff to address the need for reasonable accommodation.

Before the current injunction is lifted and the narrower preliminary injunction herein goes into effect permitting the City to enforce the Ordinance with limitations, the City shall file for the Court's review the revised map and a description of the process by which campsites may be allocated or claimed.

To be clear, this preliminary injunction does not prevent the City from currently enforcing its conventional fire and safety codes which are generally applicable so long as Plaintiffs are not displaced.  And because this action is brought as an as-applied challenge on behalf of a limited group of persons, this preliminary injunction applies only to residents of the Mahon Creek Path encampment who have standing either as individually named plaintiffs herein or via the San Rafael Homeless Union.

//

//

The Courts sets a remote status conference for November 1, 2023 at 4:00 p.m.

**IT IS SO ORDERED**.

Dated: October 19, 2023

_____
EDWARD M. CHEN
United States District Judge